Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Steven Henesy (SH 6357)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------X

LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY INSURANCE CORPORATION, THE FIRST LIBERTY INSURANCE CORPORATION, LM INSURANCE CORPORATION, LIBERTY MUTUAL MID-ATLANTIC INSURANCE COMPANY, LIBERTY COUNTY MUTUAL INSURANCE COMPANY, LM PROPERTY and CASUALTY INSURANCE COMPANY, SAFECO COMPANY OF INDIANA, and AMERICAN STATES INSURANCE COMPANY,

Plaintiffs,

-against-

MOON REHAB PT, P.C., MAHMOUD EL SAYED, KINGSTON MEDICAL, P.C., NOEL HOWELL, M.D., BD MEDICAL SERVICES, P.C., BARRY DUBLIN, M.D., APPLE CHIROPRACTIC CARE, P.C., KARRELLE BENOIT, D.C., ALPINE CHIROPRACTIC, P.C., LERON COLLINS, JR., D.C., LANTSMAN ACUPUNCTURE, P.C., YURI LANTSMAN, YUMI ACUPUNCTURE, P.C., KWON YUMI, MZ ACUPUNCTURE, P.C., STANLEY MENG, OPUS PSYCHOLOGICAL SERVICES, P.C., CAJETAN UCHENDU, Ph.D., BROOKLYN PRECISION CHIROPRACTIC, P.C., SAGLARA MILLS, D.C., SHORE PARKWAY CHIROPRACTIC, P.C., PATRICK FIORIGLIO, D.C., VLADIMIR OLSHANSKY, VO MARKETING SERVICES, INC., NICK POTIHA, TOTAL HEALTHCARE CONSULTING SERVICES, INC., SERGEY LAZAREV, CITY MED PROPERTIES, INC., and JOHN DOE DEFENDANTS 1-10,

Defendants.

---------------------------------------------------------------------------X

Docket No.:_______ (      )

**COMPLAINT**

**Plaintiff Demands a Trial by Jury**

Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company (collectively, "Liberty Mutual" or "Plaintiff"), as and for their Complaint against the Defendants, hereby allege, upon information and belief, as follows:

## NATURE OF THE ACTION

1. This action seeks to recover more than $332,000.00 that the Defendants wrongfully obtained from Liberty Mutual by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary and otherwise unreimbursable healthcare services, including bogus examinations, outcome assessment testing, physical performance testing, voltage-actuated sensory nerve conduction threshold tests, range of motion, physical therapy services, chiropractic services, acupuncture services, and mental health services (collectively the "Fraudulent Services"), that allegedly were provided to New York automobile accident victims ("Insureds").

2. The Fraudulent Services were the product of a single integrated scheme conducted at a purported medical clinic located at 205-20 Jamaica Avenue, Hollis, New York (the "Jamaica Avenue Clinic"). In furtherance of that scheme, unlicensed laypersons cultivated a patient base of Insureds that could be subjected to the Fraudulent Services. Next, the unlicensed laypersons "purchased" the licenses of healthcare professionals in order to fraudulently incorporate and control numerous healthcare professional corporations that they caused to operate at the Jamaica Avenue Clinic. In addition, the unlicensed laypersons made illegal arrangements with additional licensed healthcare professionals to have them operate other healthcare professional corporations at the Jamaica Avenue Clinic where they could access the

same patient base in exchange for the payments of kickbacks to the unlicensed laypersons. Under the direction and control of the unlicensed laypersons, the Defendants then implemented a fraudulent, predetermined treatment and billing protocol at the Jamaica Avenue Clinic in order to exploit the Insureds' no-fault insurance benefits, without regard to genuine patient care.

3. As part of the Defendants' fraudulent scheme, the Defendants billed Liberty Mutual and other New York automobile insurers for a laundry-list of high frequency and unnecessary treatments from the Jamaica Avenue Clinic, using the tax identification numbers of an ever-changing number of healthcare professional corporations, including but not limited to Defendants Moon Rehab PT, P.C. ("Moon Rehab"), Kingston Medical, P.C. ("Kingston Medical"), BD Medical Services, P.C. ("BD Medical"), Alpine Chiropractic, P.C. ("Alpine Chiropractic"), Apple Chiropractic Care, P.C. ("Apple Chiropractic"), MZ Acupuncture, P.C. ("MZ Acupuncture"), Lantsman Acupuncture, P.C. ("Lantsman Acupuncture"), and Yumi Acupuncture, P.C. ("Yumi Acupuncture"), Brooklyn Precision Chiropractic, P.C. ("Brooklyn Precision"), Shore Parkway Chiropractic, P.C. ("Shore Parkway"), and Opus Psychological Services, P.C. ("Opus Psychological") (collectively the "Provider Defendants").

4. Liberty Mutual brings this action to recover the monies stolen from it using the names of the Provider Defendants, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $384,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the Provider Defendants, because:

(i) the Provider Defendants were fraudulently incorporated, unlawfully owned and controlled by unlicensed laypersons, and/or unlawfully engaged in illegal kickback arrangements with unlicensed laypersons and, therefore, were ineligible to bill for or to collect no-fault benefits;

(ii) the Fraudulent Services were not medically necessary and were provided pursuant to predetermined fraudulent protocols controlled by unlicensed laypersons and designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual; and

5. The Defendants fall into the following categories:

(i) The Provider Defendants are professional corporations through which the Fraudulent Services purportedly were performed and billed to insurance companies, including Liberty Mutual.

(ii) Mahmoud El-Sayed ("El-Sayed"), Noel Howell, M.D. ("Howell"), Barry Dublin, M.D. ("Dublin"), Leron Collins, Jr., D.C. ("Collins"), Karrelle Benoit, D.C. ("Benoit"), Stanley Meng ("Meng"), Yuri Lantsman ("Lantsman"), and Kwon Yumi ("Yumi") (collectively the "Nominal Owner Defendants") are or were licensed medical professionals who falsely purported to own certain of the Provider Defendants and engaged in fee-splitting and kickback relationships with unlicensed laypersons.

(iii) Saglara Mills, D.C. ("Mills"), Patrick Fioriglio, D.C. ("Fioriglio"), and Caejtan Uchendu, Ph.D. ("Uchendu") (the "Kickback Owner Defendants") are or were licensed medical professionals who falsely purported to control certain of the Provider Defendants while they operated at the Jamaica Avenue Clinic and who engaged in fee-splitting and kickback relationships with unlicensed laypersons.

(iv) Defendants Nick Potiha ("Potiha"), Total Healthcare Consulting Services, Inc. ("Total Healthcare"), Vladimir Olshansky ("Olshansky"), VO Marketing Services, Inc. ("VO Marketing"), Sergey Lazarev ("Lazarev"), City Med Properties, Inc. ("City Med"), and John Doe Defendants Nos. 1-10 (collectively the "Management Defendants") are not licensed healthcare professionals but nevertheless illegally owned and/or controlled the Provider Defendants and the clinic from which the Provider Defendants operated, paid kickbacks for patient referrals, and caused Insureds to be referred amongst the Provider Defendants for the Fraudulent Services. The Management Defendants also solicited and accepted kickbacks from the Kickback Owner Defendants in exchange for access to the patient base at the Jamaica Avenue Clinic.

6. As discussed below, the Defendants at all relevant times have known that: (i) the Provider Defendants were fraudulently incorporated, unlawfully owned and/or controlled by unlicensed laypersons; (ii) the Provider Defendants unlawfully split fees with unlicensed individuals and/or engaged in illegal kickback arrangements with them; (iii) the Fraudulent Services were not medically necessary and were provided pursuant to predetermined fraudulent

protocols controlled by unlicensed laypersons and designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (iv) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual.

7. As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to Liberty Mutual through the Provider Defendants or Kickback Defendants.

8. The charts annexed hereto as Exhibits "1" – "11" set forth the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to Liberty Mutual.

9. The Defendants' fraudulent scheme perpetrated against Liberty Mutual and other New York insurers began as early as 2015 and continues uninterrupted through present day. As a result of the Defendants' scheme, Liberty Mutual has incurred damages of more than $332,000.00.

## THE PARTIES

### I. Plaintiffs

10. Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations with their principal place of business in Boston, Massachusetts. Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

11. Plaintiffs Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are Illinois corporations with their principal place of business in

Boston, Massachusetts. Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

12. Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts. Liberty Mutual Fire Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

13. Plaintiff Liberty County Mutual Insurance Company is a Texas corporation with its principal place of business in Boston, Massachusetts. Liberty County Mutual Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

14. Plaintiffs LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are Indiana corporations with its principal place of business in Boston, Massachusetts. LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II. <u>Defendants</u>

15. Defendant Moon Rehab is a fraudulently incorporated New York physical therapy professional corporation with its principal place of business in New York, through which the Fraudulent Services have been billed to insurance companies, including Liberty Mutual.

16. Moon Rehab is nominally owned by El Sayed, but in actuality has at all relevant times herein been fraudulently owned and controlled by unlicensed non-medical professionals in contravention of New York law.

17. Defendant El Sayed resides in and is a citizen of New York. El Sayed was licensed to practice physical therapy in New York on April 3, 2007, purported to perform many of the Fraudulent Services, and purported to own Moon Rehab.

18. Defendant Kingston Medical is a fraudulently incorporated New York medical professional corporation with its principal place of business in New York, through which the Fraudulent Services have been billed to insurance companies, including Liberty Mutual.

19. Kingston Medical is nominally owned by Howell, but in actuality has at all relevant times herein been fraudulently owned and controlled by unlicensed non-medical professionals in contravention of New York law.

20. Defendant Howell resides in and is a citizen of New York. Howell was licensed to practice medicine in New York on June 30, 2000, purported to perform many of the Fraudulent Services, and purported to own Kingston Medical.

21. Defendant BD Medical is a fraudulently incorporated New York medical professional corporation with its principal place of business in New York, through which the Fraudulent Services have been billed to insurance companies, including Liberty Mutual.

22. BD Medical is nominally owned by Dublin, but in actuality has at all relevant times herein been fraudulently owned and controlled by unlicensed non-medical professionals in contravention of New York law.

23. Defendant Dublin resides in and is a citizen of New York. Dublin was licensed to practice medicine in New York on June 27, 1995 (though his license is currently subject to probation), purported to perform many of the Fraudulent Services, and purported to own BD Medical.

24. Defendant MZ Acupuncture is a fraudulently incorporated New York acupuncture professional corporation with its principal place of business in New York, through which the Fraudulent Services have been billed to insurance companies, including Liberty Mutual.

25. MZ Acupuncture is nominally owned by Meng, but in actuality has at all relevant times herein been fraudulently owned and controlled by unlicensed non-medical professionals in contravention of New York law.

26. Defendant Meng resides in and is a citizen of New York. Meng was licensed to practice acupuncture in New York on February 13, 2001, purported to perform many of the Fraudulent Services, and purported to own MZ Acupuncture.

27. Defendant Lantsman Acupuncture is a fraudulently incorporated New York acupuncture professional corporation with its principal place of business in New York, through which the Fraudulent Services have been billed to insurance companies, including Liberty Mutual.

28. Lantsman Acupuncture is nominally owned by Lantsman, but in actuality has at all relevant times herein been fraudulently owned and controlled by unlicensed non-medical professionals in contravention of New York law.

29. Defendant Lantsman resides in and is a citizen of New Jersey. Lantsman was licensed to practice acupuncture in New York on January 31, 2005, purported to perform many of the Fraudulent Services, and purported to own Lantsman Acupuncture.

30. Defendant Yumi Acupuncture is a fraudulently incorporated New York acupuncture professional corporation with its principal place of business in New York, through which the Fraudulent Services have been billed to insurance companies, including Liberty Mutual.

31. Yumi Acupuncture is nominally owned by Yumi, but in actuality has at all relevant times herein been fraudulently owned and controlled by unlicensed non-medical professionals in contravention of New York law.

32. Defendant Yumi resides in and is a citizen of New Jersey. Yumi was licensed to practice acupuncture in New York on July 24, 2014, purported to perform many of the Fraudulent Services, and purported to own Yumi Acupuncture.

33. Defendant Alpine Chiropractic is a fraudulently incorporated New York chiropractic professional corporation, with its principal place of business in New York, through which the Fraudulent Services have been billed to insurance companies, including Liberty Mutual.

34. Alpine Chiropractic was fraudulently incorporated on January 28, 2016, and nominally is owned on paper by Collins, but in actuality always has at all relevant times herein been owned and controlled by unlicensed non-medical professionals in contravention of New York law.

35. Defendant Collins resides in and is a citizen of New York, and was licensed as a chiropractor in New York on December 9, 2013, purported to perform many of the Fraudulent Services, and purported to own Alpine Chiropractic.

36. Defendant Apple Chiropractic is a fraudulently incorporated New York chiropractic professional corporation, with its principal place of business in New York, through which the Fraudulent Services have been billed to insurance companies, including Liberty Mutual.

37. Apple Chiropractic was fraudulently incorporated on November 13, 2014, and nominally is owned on paper by Benoit, but in actuality always has at all relevant times herein

been owned and controlled by unlicensed non-medical professionals in contravention of New York law.

38. Defendant Benoit resides in and is a citizen of New Jersey, was licensed as a chiropractor in New York on March 5, 2001, purported to perform many of the Fraudulent Services, and purported to own Apple Chiropractic.

39. Defendant Opus Psychological is a New York professional corporation with its principal place of business in New York, through which the Fraudulent Services have been billed to insurance companies, including Liberty Mutual.

40. Opus Psychological was incorporated on June 1, 2012, and is owned on paper by Uchendu.

41. Defendant Uchendu resides in and is a citizen of New York, and was licensed as a psychologist in New York on December 11, 2007, purported to perform many of the Fraudulent Services, and purported to own Defendant Opus Psychological.

42. Defendant Brooklyn Precision is a New York professional corporation with its principal place of business in New York, through which the Fraudulent Services have been billed to insurance companies, including Liberty Mutual.

43. Brooklyn Precision was incorporated on January 5, 2015, and is owned on paper by Mills.

44. Defendant Mills resides in and is a citizen of New York, was licensed to practice chiropractic in New York on July 7, 2010, purported to perform many of the Fraudulent Services, and purported to own Brooklyn Precision.

45. Defendant Shore Parkway is a New York professional corporation with its principal place of business in New York, through which the Fraudulent Services have been billed to insurance companies, including Liberty Mutual.

46. Shore Parkway was incorporated on September 1, 2016, and is owned on paper by Fioriglio.

47. Defendant Fioriglio resides in and is a citizen of New York, was licensed to practice chiropractic in New York on January 21, 1992, purported to perform many of the Fraudulent Services, and purported to own Shore Parkway.

48. Defendant VO Marketing is a New York corporation with its principal place of business at the Jamaica Avenue Clinic. VO Marketing was incorporated on September 30, 2014, is owned by Olshansky, and has been used to illegally own and control the Provider Defendants, and to siphon revenues from the Provider Defendants to non-medical professionals.

49. Defendant Olshansky resides in and is a citizen of New York. Olshansky has never been a licensed medical professional, yet owned, controlled, and derived economic benefit from the Provider Defendants, and split fees with the Provider Defendants, in contravention of New York Law.

50. Defendant Total Healthcare is a New York corporation with its principal place of business at 50 Pecan Valley Drive, New City, New York 10956. Total Healthcare was incorporated on June 19, 2014, is owned by Potiha, and has been used to illegally own and control the Provider Defendants, and to siphon revenues from the Provider Defendants to non-medical professionals.

51. Defendant Potiha resides in and is a citizen of New York. Potiha has never been a licensed medical professional, yet owned, controlled, and derived economic benefit from the Provider Defendants, and split fees with the Provider Defendants, in contravention of New York Law.

52. Defendant City Med is a New York corporation with its principal place of business at the Jamaica Avenue Clinic. City Med was incorporated on June 22, 2016, is owned

by Lazarev, and has been used to illegally own and control the Provider Defendants, and to siphon revenues from the Provider Defendants to non-medical professionals.

53. Defendant Lazarev resides in and is a citizen of New York. Lazarev has never been a licensed medical professional, yet owned, controlled, and derived economic benefit from the Provider Defendants, and split fees with the Provider Defendants in contravention of New York law.

54. Upon information and belief, John Doe Defendants 1-10 reside in and are citizens of New York. John Doe Defendants 1-10 are individuals and entities, presently not identifiable, who are not and never have been licensed medical professionals, yet – together with Olshansky, VO Marketing, Potiha, and Total Healthcare – have owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law, and have split fees with the Provider Defendants in contravention of New York law.

## JURISDICTION AND VENUE

55. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

56. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

57. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this

is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I. An Overview of the No-Fault Laws and Licensing Statutes

58. Liberty Mutual underwrites automobile insurance in New York.

59. New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

60. No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

61. An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services. Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

62. Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

63. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

64. In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

65. New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals; prohibits aiding and abetting an unlicensed person to practice a profession; prohibits offering any fee or consideration to a third party for the referral of a patient; and prohibits permitting any person not authorized to practice medicine to share in the fees for professional services.

66. Additionally, New York law requires that the shareholders of a professional corporation be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed.

67. Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it pays or receives unlawful kickbacks in exchange for patient referrals, and/or is "owned" by professionals who do not engage in the practice of their profession through the professional corporation.

68. In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

69. Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

70. Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were

rendered by persons who were not employees of the professional corporation, such as independent contractors.

71. In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

72. When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

73. Pursuant to New York Insurance Law § 403, the bills, NF-3s and HCFA-1500 Forms submitted by a healthcare provider to Liberty Mutual, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II. <u>The Defendants' Fraudulent Scheme</u>

74. Beginning in late 2015, Defendants masterminded and implemented a complex fraudulent scheme wherein the Provider Defendants were used as part of an integrated scheme to bill Liberty Mutual and the New York automobile insurance industry for millions of dollars in No-Fault insurance benefits they were never entitled to receive.

75. At all relevant times herein, the Management Defendants controlled a multidisciplinary health care clinic located at 205-20 Jamaica Avenue, Queens, New York, i.e.,

the Jamaica Avenue Clinic, unlawfully controlled a patient base, and unlawfully owned and/or controlled the healthcare providers operating within that clinic.

76. Using the Jamaica Avenue Clinic as the center of their operations, the Management Defendants devised a complex fraudulent scheme which saw them: (i) retain runners - individuals who, for pecuniary benefit, solicited patients at the direction of the Management Defendants - to help the Management Defendants build a patient base that they could subject to a pre-determined testing and treatment protocol; (ii) "purchase" the license of multiple licensed professionals and use those licenses to incorporate, own, and/or control professional corporations; (iii) recruit other licensed professionals to pay kickbacks to permit additional professional corporations to access the patient base, all so that the patient base could be exploited for financial gain without regard to genuine patient care.

77. As an initial step in their fraudulent scheme, the Management Defendants obtained control of the Jamaica Avenue Clinic in late 2014 with the intent of renovating the space to allow for its operation as a high-volume no-fault mill.

78. Concurrently, in mid- to late- 2014, Olshansky and Potiha caused Total Healthcare and VO Marketing to be incorporated.

79. Following the renovation of the Jamaica Avenue Clinic, the Management Defendants set about recruiting healthcare professionals and professional corporations that they would control and/or which they could arrange to "practice" out of the Jamaica Avenue Clinic.

80. Potiha, Olshansky, and Lazarev operated, owned, and controlled the Jamaica Avenue Clinic – as well as the putative healthcare providers operating therefrom – through their corporations Total Healthcare, VO Marketing, and City Med. These corporations served as vehicles through which Potiha, Olshansky, and Lazarev could make and receive illegal payments in furtherance of their fraudulent scheme.

81. Though ostensibly organized to provide a range of health care services to Insureds at a single location, the Jamaica Avenue Clinic was actually organized to be a convenient, one-stop shop for No-Fault insurance fraud.

82. In fact, in addition to the Provider Defendants named in this complaint, there have been many other healthcare providers and professional corporations that have billed Liberty Mutual rapidly and excessively for an array of healthcare services allegedly provided at the Jamaica Avenue Clinic.

83. Liberty Mutual received billing for alleged treatments to Insureds that reportedly took place at the Jamaica Avenue Clinic from more than 30 purported healthcare providers, which providers opened and closed at the location without any rational basis, without any actual "sale" or "purchase" of a healthcare practice by any legitimate professional owner, and without any legitimate transfer of patient care from one professional to another.

84. Notwithstanding the frequent change of professional corporations and healthcare providers at the Jamaica Avenue Clinic, the Jamaica Avenue Clinic had a constant base of Insureds who could be subjected to the Fraudulent Services, which patient base was cultivated and controlled at all times by the Management Defendants, not by the Nominal Owner Defendants or the Kickback Owner Defendants.

85. Notwithstanding the frequent change of professional corporations and healthcare providers at the Jamaica Avenue Clinic, the Defendants engaged in a common plan to exploit that patient base by implementing a fraudulent, predetermined treatment and billing protocol, "passing around" the Insureds among the different providers operating at the Jamaica Avenue Clinic, and splitting the billing for the fraudulent care and treatment allegedly provided across multiple professional corporations to artificially reduce the amount of billing submitted to prevent the detection of the fraudulent conduct by each of them.

86. Beginning in late 2014, the Management Defendants recruited the Nominal Owner Defendants and the Kickback Owner Defendants, all licensed medical professionals who were willing to either (i) sell to the Management Defendants the use of their professional licenses, so that they could fraudulently incorporate the Provider Defendants or take over ownership and control of those previously incorporated Provider Defendants or (ii) have additional Provider Defendants operate at the Jamaica Avenue Clinic under the control of the Management Defendants and pursuant to fee-splitting and kickback relationships.

87. Although the Nominal Owner Defendants are listed as the record owners of certain of the Provider Defendants on the Certificates of Incorporation or appear to be the owners and operators of medical practices operated under their own names, the Nominal Owner Defendants exercised no ownership or control over the professional practices that were operated under their names and licenses.

88. Although the Kickback Owner Defendants are listed as the record owners of the Provider Defendants on the Certificates of Incorporation or appear to be the owners and operators of medical practices operated under their own names, the Kickback Owner Defendants exercised no control over the professional practices when they operated under their names and licenses at the Jamaica Avenue Clinic.

89. The Nominal Owner Defendants and the Kickback Owner Defendants, though purporting to be the owners of the Provider Defendants, did nothing to aid the start-up of the "practices" operated under their names and licenses at the Jamaica Avenue Clinic.

90. The Nominal Owner Defendants and the Kickback Owner Defendants did not invest any "start-up" or "acquisition" monies out of their own pocket to create and/or maintain the "practices" at the Jamaica Avenue Clinic.

91. The Nominal Owners Defendants and the Kickback Owner Defendants did not advertise or market their association with the Provider Defendants to the general public.

92. The Provider Defendants did not advertise or market their services, or their association with the Jamaica Avenue Clinic, to the general public

93. The Nominal Owner Defendants and the Kickback Owner Defendants did not have their own patients, and did nothing to attract patients or create a patient base for the "practices" at the Jamaica Avenue Clinic.

94. The Management Defendants, rather than the Nominal Owner Defendants or the Kickback Owner Defendants, created and controlled the patient base at the Jamaica Avenue Clinic.

95. The Provider Defendants merely appeared at the Jamaica Avenue Clinic and immediately began treating, or purporting to treat, patients under the direction and control of the Management Defendants. The Management Defendants ensured that patients would be waiting at the Jamaica Avenue Clinic to be "treated" under the names of Provider Defendants, without any effort by the Nominal Owner Defendants or the Kickback Owner Defendants.

96. In fact, the patient base at the Jamaica Avenue Clinic was established through a network of individuals (the "runners") who were paid by the Management Defendants for each Insured they delivered to the Clinic that could be subjected to medically useless treatment rendered under the names of the Provider Defendants.

97. The Management Defendants also paid drivers to ensure that at least some patients would be picked up and transported to the Jamaica Avenue Clinic to create a continuing flow of patients, or the appearance of a continuing flow of patients, to support the Fraudulent Services billed to Liberty Mutual.

98. The Jamaica Avenue Clinic thereafter served as a "revolving door" for various putative healthcare practices, which open and closed to avoid detection of the fraudulent scheme by insurers. When one of the Provider Defendants ceased its operations at the Clinic, the Management Defendants simply replaced that provider with a new provider of the same type, which would then proceed to "treat" the Clinic's existing patients under the direction and control of the Management Defendants.

99. For example, and as described more fully below, Yumi Acupuncture was used by the Management Defendants for parts of 2015 and 2016 to provide putative acupuncture services to Insureds at the Jamaica Avenue Clinic. Then, on April 19, 2016, Yumi Acupuncture ceased its operations at the Clinic. The following Monday, May 2, 2016, MZ Acupuncture began "operating" at the Jamaica Avenue Clinic. However, MZ Acupuncture did not have – nor did it attempt to generate – its own patient base. Instead, MZ Acupuncture purported to treat the same patients that had previously been treated by Yumi Acupuncture.

100. The payments by the Managements Defendants to the runners and drivers that fueled the patient base at the Jamaica Avenue Clinic were monies that the Management Defendants illegally siphoned from the Provider Defendants and/or obtained from them in the form of unlawful kickbacks, fee-splitting and payments for referrals.

101. Once patients arrived at the Jamaica Avenue Clinic for treatment, the Management Defendants dictated the medical services that each patient received from the Provider Defendants, regardless of the actual medical needs of the patients themselves.

102. Once patients arrived at the Jamaica Avenue Clinic for treatment, the Management Defendants dictated what services each Provider Defendant could render, or purport to render, to each patient, regardless of the actual medical needs of the patients themselves.

103. The Management Defendants established predetermined treatment protocols in order to bill for voluminous, unnecessary, and excessive treatments that were provided (or purported to be provided) regardless of the actual medical needs of each individual Insured.

104. The Nominal Owner Defendants and the Kickback Owner Defendants had no genuine doctor-patient relationship with the Insureds that visited the Jamaica Avenue Clinic, as the patients had no scheduled appointments but were simply directed by the Management Defendants to subject themselves to treatment by whatever healthcare providers were on duty that day at the Clinic.

105. Throughout the course of the Nominal Owner Defendants' and the Kickback Owner Defendants' relationship with the Management Defendants, all decision-making authority relating to the operation and management of the Provider Defendants at the Jamaica Avenue Clinic was vested entirely with the Management Defendants.

106. The Management Defendants' decision-making authority relating to the operation and management of the Provider Defendants at the Jamaica Avenue Clinic included control over the treatment protocols, the hiring of individuals who allegedly performed the Fraudulent Services, the hiring of administrative employees, the control over how the services would be billed to insurers, including Liberty Mutual, and how the profits of the Provider Defendants were dispersed.

## A. The Purchase of the Nominal Owner Defendants' Licenses and Fraudulent Incorporation of Many of the Provider Defendants

### 1. The Purchase of Howell's Medical License and the Fraudulent Incorporation of Kingston Medical

107. In late 2014, the Management Defendants recruited Howell, a licensed physician who was willing to sell them the use of his medical license so that they could fraudulently incorporate Kingston Medical.

108. Kingston Medical was fraudulently incorporated on January 23, 2015, and nominally is owned on paper by Howell, but in actuality always has been owned and controlled by unlicensed non-medical professionals in contravention of New York law.

109. In order to circumvent New York law and to induce the New York State Education Department (the "Education Department") to issue a certificate of authority authorizing Kingston Medical to operate a medical practice, the Management Defendants entered into a secret scheme with Howell.

110. In late 2014, in exchange for a designated salary or other form of compensation from the Management Defendants, Howell agreed to falsely represent in the certificate of incorporation and related filings with New York State, that he was the true shareholder, director, and officer of Kingston Medical and that he truly owned, controlled, and practiced through the professional corporation.

111. Howell agreed to falsely represent in the certificate of incorporation and related filings with New York State that he was the true shareholder, director, and officer of Kingston Medical and that he truly owned, controlled, and practiced through the professional corporation, knowing that the professional corporation would be used to submit fraudulent billing to insurers.

112. Once Kingston Medical was fraudulently incorporated on January 23, 2015, Howell ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

113. The Management Defendants – rather than Howell – provided all start-up costs and investment in Kingston Medical.

114. Howell did not incur any costs to establish Kingston Medical's practice, nor did he invest any money in the professional corporation he purportedly owned.

115. Howell did not market his services for Kingston or make any effort to create a patient base.

116. The Management Defendants caused Kingston Medical to commence operations at the Jamaica Avenue Clinic – a location that the Management Defendants controlled – alongside other professional corporations they controlled at the Jamaica Avenue Clinic.

117. Howell never was the true shareholder, director, or officer of Kingston Medical, and never had any true ownership interest in or control over the professional corporation.

118. True ownership and control over Kingston Medical always rested entirely with the Management Defendants, who used the façade of Kingston Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

119. Howell had no key to the Jamaica Avenue Clinic, despite purporting to be the owner of Kingston Medical.

120. Howell had no patients of his own at the Jamaica Avenue Clinic, despite purporting to be the owner of Kingston Medical.

121. Howell did not control the treatments rendered, the referrals made, or the prescriptions issued under the name of Kingston Medical.

122. Howell and Kingston Medical purported to have a lease for the premises at the Jamaica Avenue Clinic but the lease was a sham in that Kingston Medical's operations (as well as its purported lease payments) began and terminated without regard for the lease terms, which terms were never actually enforced by either party because they knew the lease was a sham.

123. Howell's lease was also a sham as the Management Defendants allowed other medical doctors to render, or purport to render, the same services as Howell to the same patient

base at the Jamaica Avenue Clinic, during the same periods of time, in contravention of the intent of a lease and in direct competition with Howell and his professional corporation.,

124. The lease existed solely to create the appearance of a legitimate landlord/tent relationship between Kingston Medical and the Management Defendants.

125. In addition, Howell never controlled or maintained any of Kingston Medical's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Kingston Medical's financial affairs; never hired or supervised any of Kingston Medical's employees or independent contractors; and was unaware of fundamental aspects of how Kingston Medical operated.

126. In reality, Howell was never anything more than a de facto employee of the Management Defendants.

127. In mid-2016, Kingston Medical ceased its operations at the Jamaica Avenue Clinic.

128. When Kingston Medical ceased its operations at the Jamaica Avenue Clinic, it did not sell or transfer its practice, did not assign or transfer its purported lease, did not sell or transfer any medical equipment, and did not make any legitimate arrangements to transfer patient care to another medical practice.

**2. The Purchase of Dublin's Medical License and Ownership of BD Medical**

129. In mid-2016, in order to replace Kingston Medical, the Management Defendants recruited Dublin, a licensed physician who was willing to sell them the use of his medical license as well as complete ownership and control of BD Medical, a preexisting medical professional corporation formed by Dublin in 2010.

130. In order to circumvent New York law and to induce the Education Department to issue a certificate of authority authorizing BD Medical to operate a medical practice, the Management Defendants entered into a secret scheme with Dublin.

131. In exchange for a designated salary or other form of compensation from the Management Defendants, in mid-2016, Dublin agreed to falsely represent in the certificate of incorporation and related filings with New York State, that he was the true shareholder, director, and officer of BD Medical and that he truly owned, controlled, and practiced through the professional corporation.

132. Dublin did not incur any costs to establish BD Medical's practice, nor did he invest any money in the professional corporation he purportedly owned.

133. Dublin did not market his services for BD Medical or make any effort to create a patient base.

134. Thereafter, the Management Defendants caused BD Medical to commence operations at the Jamaica Avenue Clinic – a location that the Management Defendants controlled – alongside other professional corporations they controlled at the Jamaica Avenue Clinic.

135. Beginning in mid-2016, Dublin never was the true shareholder, director, or officer of BD Medical, and never had any true ownership interest in or control over the professional corporation.

136. Beginning in mid-2016, true ownership and control over BD Medical always rested entirely with the Management Defendants, who used the façade of BD Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

137. Beginning in mid-2016, Dublin exercised absolutely no control over or ownership interest in BD Medical. All decision-making authority relating to the operation and management of BD Medical was vested entirely with the Management Defendants.

138. In addition, beginning in mid-2016, Dublin never controlled or maintained any of BD Medical's books or records, including its bank accounts; never selected, directed, and/or

controlled any of the individuals or entities responsible for handling any aspect of BD Medical's financial affairs; never hired or supervised any of BD Medical's employees or independent contractors; and was unaware of fundamental aspects of how BD Medical operated.

139. In keeping with the fact that Dublin exercised no control over BD Medical, the treatment Dublin purportedly performed at the Jamaica Avenue Clinic was the exact same treatment that Howell purportedly performed through BD Medical during his time at the Jamaica Avenue Clinic.

140. In keeping with the fact that Dublin exercised no control over BD Medical, Dublin used boilerplate reports similar to Howell that (i) offered substantially similar boilerplate diagnoses of back sprain/strain and (ii) offered verbatim statements of medical necessity for the other Fraudulent Services purportedly provided by the Provider Defendants at the Jamaica Avenue Clinic.

141. In addition, Dublin never controlled or maintained any of BD Medical's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of BD Medical's financial affairs; never hired or supervised any of BD Medical's employees or independent contractors; and was unaware of fundamental aspects of how BD Medical operated.

142. In reality, Dublin was never anything more than a de facto employee of the Management Defendants.

143. Dublin was recently placed on probation pursuant to a Determination and Order of the NYS Department of Health/State Board for Professional Misconduct, dated April 13, 2017, in connection with his work for a number of medical clinics conducting nerve conduction studies, whereby the state board sustained charges of practicing incompetently and failing to maintain accurate records.

### 3. The Purchase of Benoit's Chiropractic License and the Fraudulent Incorporation of Apple Chiropractic

144. In late 2014, the Management Defendants recruited Benoit, a licensed chiropractor who was willing to sell them the use of his chiropractic license so that they could fraudulently incorporate Apple Chiropractic.

145. Apple Chiropractic was fraudulently incorporated on November 13, 2014, and nominally is owned on paper by Benoit, but in actuality always has been owned and controlled by unlicensed non-medical professionals in contravention of New York law.

146. In order to circumvent New York law and to induce the Education Department to issue a certificate of authority authorizing Apple Chiropractic to operate a medical practice, the Management Defendants entered into a secret scheme with Benoit.

147. In exchange for a designated salary or other form of compensation from the Management Defendants, in late 2014 Benoit agreed to falsely represent in the certificate of incorporation and related filings with New York State, that he was the true shareholder, director, and officer of Apple Chiropractic and that he truly owned, controlled, and practiced through the professional corporation.

148. Benoit agreed to falsely represent in the certificate of incorporation and related filings with New York State that he was the true shareholder, director, and officer of Apple Chiropractic and that he truly owned, controlled, and practiced through the professional corporation, knowing that the professional corporation would be used to submit fraudulent billing to insurers.

149. Benoit is no stranger to fraudulent schemes of this nature. In fact, another professional corporation that Benoit purported to "own" – Benoit Chiropractic, P.C. – was identified by the United States Department of Justice as a professional corporation utilized in

furtherance of the fraudulent scheme of a number of unlicensed laypersons who owned and controlled a series of professional corporations in connection with one of the largest no-fault insurance fraud schemes ever recorded. See United States of America v. Zemlyansky, 12-CR-00171 (S.D.N.Y. 2012).

150. Once Apple Chiropractic was fraudulently incorporated on November 13, 2014, Benoit ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

151. The Management Defendants – rather than Benoit – provided all start-up costs and investment in Apple Chiropractic.

152. Benoit did not incur any costs to establish Apple Chiropractic's practice, nor did he invest any money in the professional corporation he purportedly owned.

153. Benoit did not market his services for Apple Chiropractic or make any effort to create a patient base.

154. Thereafter, the Management Defendants caused Apple Chiropractic to commence operations at the Jamaica Avenue Clinic – a location that the Management Defendants controlled – alongside other professional corporations they controlled at the Jamaica Avenue Clinic.

155. Benoit never was the true shareholder, director, or officer of Apple Chiropractic, and never had any true ownership interest in or control over the professional corporation. True ownership and control over Apple Chiropractic always rested entirely with the Management Defendants, who used the façade of Apple Chiropractic to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

156. Benoit exercised absolutely no control over or ownership interest in Apple Chiropractic.

157. All decision-making authority relating to the operation and management of Apple Chiropractic was vested entirely with the Management Defendants.

158. In addition, Benoit never controlled or maintained any of Apple Chiropractic's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Apple Chiropractic's financial affairs; never hired or supervised any of Apple Chiropractic's employees or independent contractors; and was unaware of fundamental aspects of how Apple Chiropractic operated.

159. In keeping with the fact that Benoit exercised no genuine ownership interest in or control over Apple Chiropractic, he never actually practiced chiropractic through the professional corporation.

160. In reality, Benoit was never anything more than a de facto employee of the Management Defendants, who did not actually perform any services at all for the professional corporation.

161. In early 2016, Apple Chiropractic ceased its operations at the Jamaica Avenue Clinic.

**4. The Purchase of Collins's Chiropractic License and the Fraudulent Incorporation of Alpine Chiropractic**

162. In early 2016, in order to replace Apple Chiropractic, the Management Defendants recruited Collins, a licensed chiropractor who was willing to sell them the use of his chiropractic license so that they could fraudulently incorporate Alpine Chiropractic.

163. Alpine Chiropractic was fraudulently incorporated on January 28, 2016, and nominally is owned on paper by Collins, but in actuality always has been owned and controlled by unlicensed non-medical professionals in contravention of New York law.

164. In order to circumvent New York law and to induce the Education Department to issue a certificate of authority authorizing Alpine Chiropractic to operate a medical practice, the Management Defendants entered into a secret scheme with Collins.

165. In exchange for a designated salary or other form of compensation from the Management Defendants, Collins agreed to falsely represent in the certificate of incorporation and related filings with New York State, that he was the true shareholder, director, and officer of Alpine Chiropractic and that he truly owned, controlled, and practiced through the professional corporation.

166. Collins agreed to falsely represent in the certificate of incorporation and related filings with New York State that he was the true shareholder, director, and officer of Alpine Chiropractic and that he truly owned, controlled, and practiced through the professional corporation, knowing that the professional corporation would be used to submit fraudulent billing to insurers.

167. Once Alpine Chiropractic was fraudulently incorporated on January 28, 2016, Collins ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

168. The Management Defendants – rather than Collins – provided all start-up costs and investment in Alpine Chiropractic.

169. Collins did not incur any costs to establish Alpine Chiropractic's practice, nor did he invest any money in the professional corporation he purportedly owned.

170. Collins did not market his services for Alpine Chiropractic or make any effort to create a patient base.

171. Thereafter, the Management Defendants caused Alpine Chiropractic to commence operations at the Jamaica Avenue Clinic – a location that the Management Defendants controlled – alongside other professional corporations they controlled at the Jamaica Avenue Clinic.

172. Collins never was the true shareholder, director, or officer of Alpine Chiropractic, and never had any true ownership interest in or control over the professional corporation. True ownership and control over Alpine Chiropractic always rested entirely with the Management Defendants, who used the façade of Alpine Chiropractic to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

173. Collins exercised absolutely no control over or ownership interest in Alpine Chiropractic.

174. All decision-making authority relating to the operation and management of Alpine Chiropractic was vested entirely with the Management Defendants.

175. In addition, Collins never controlled or maintained any of Alpine Chiropractic's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Alpine Chiropractic's financial affairs; never hired or supervised any of Alpine Chiropractic's employees or independent contractors; and was unaware of fundamental aspects of how Alpine Chiropractic operated.

176. In keeping with the fact that Collins exercised no genuine ownership interest in or control over Alpine Chiropractic, he never actually practiced chiropractic through the professional corporation.

177. In reality, Collins was never anything more than a de facto employee of the Management Defendants, who did not actually perform any services at all for the professional corporation.

178. As set forth in greater detail below, and in keeping with the fact that both Apple Chiropractic and its successor, Alpine Chiropractic were owned and controlled by the Management Defendants, the operations of the two ostensibly-independent chiropractic professional corporations were virtually identical.

**5. The Purchase of El Sayed's Physical Therapy License and Ownership of Moon Rehab**

179. In early 2015, the Management Defendants recruited El Sayed, a licensed physical therapist who was willing to sell them the use of his physical therapy license as well as complete ownership and control of Moon Rehab, a preexisting physical therapy professional corporation formed by El Sayed in 2010.

180. In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with El Sayed, wherein, in exchange for a designated salary or other form of compensation, El Sayed agreed to falsely represent in the certificate of incorporation and related filings with New York State, that he was the true shareholder, director, and officer of Moon Rehab and that he truly owned, controlled, and practiced through the professional corporation.

181. El Sayed agreed to falsely represent in the certificate of incorporation and related filings with New York State that he continued to be the true shareholder, director, and officer of Moon Rehab and that he truly owned, controlled, and practiced through the professional corporation, knowing that the professional corporation would be used to submit fraudulent billing to insurers.

182. The Management Defendants – rather than El Sayed – provided all costs associated with establishing Moon Rehab in the clinics controlled by the Management Defendants, and all

investment in Moon Rehab subsequent to the purchase of El Sayed's physical therapy license by the Management Defendants in early 2016.

183. El Sayed did not incur any costs to establish Moon Rehab's practice at the Jamaica Avenue Clinic, nor did he invest any money in the professional corporation he purportedly owned subsequent to the purchase of his physical therapy license by the Management Defendants.

184. Thereafter, the Management Defendants caused Moon Rehab to commence operations at the Jamaica Avenue Clinic, alongside other professional corporations that the Management Defendants controlled.

185. El Sayed was no longer the true shareholder, director, or officer of Moon Rehab, and no longer had any true ownership interest in or control over the professional corporation.

186. Subsequent to the purchase of El Sayed's physical therapy license, true ownership and control over Moon Rehab always rested entirely with the Management Defendants, who used the façade of Moon Rehab to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

187. Subsequent to the purchase of his physical therapy license by the Management Defendants, El Sayed exercised absolutely no control over or ownership interest in Moon Rehab.

188. All decision-making authority relating to the operation and management of Moon Rehab was vested entirely with the Management Defendants.

189. In addition, subsequent to the purchase of his physical therapy license by the Management Defendants, El Sayed did not control or maintain any of Moon Rehab's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Moon Rehab's financial affairs; never

hired or supervised any of Moon Rehab's employees or independent contractors; and was unaware of fundamental aspects of how Moon Rehab operated.

190. In reality, El Sayed was never anything more than a de facto employee of the Management Defendants.

**6. The Purchase of Lantsman's Acupuncture License and the Ownership of Lantsman Acupuncture**

191. In early 2015, the Management Defendants recruited Lantsman, a licensed acupuncturist who was willing to sell them the use of his acupuncture licensed as well as complete ownership and control of Lantsman Acupuncture, a preexisting a preexisting acupuncture professional corporation formed in 2006.

192. In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Lantsman, wherein, in exchange for a designated salary or other form of compensation, Lantsman agreed to falsely represent that he was the true shareholder, director, and officer of Lantsman Acupuncture and that he truly owned, controlled, and practiced through the professional corporation.

193. Lantsman agreed to falsely represent in the certificate of incorporation and related filings with New York State that he continued to be the true shareholder, director, and officer of Lantsman Acupuncture and that he truly owned, controlled, and practiced through the professional corporation, knowing that the professional corporation would be used to submit fraudulent billing to insurers.

194. The Management Defendants – rather than Lantsman – provided all costs associated with establishing Lantsman Acupuncture in the Jamaica Avenue Clinic, and all

investment in Lantsman Acupuncture subsequent to the purchase of Lantsman's acupuncture license by the Management Defendants in early 2015.

195. Lantsman did not incur any costs to establish Lantsman Acupuncture's practice at the Jamaica Avenue Clinic, nor did he invest any money in the professional corporation he purportedly owned subsequent to the purchase of his acupuncture license by the Management Defendants.

196. Thereafter, the Management Defendants caused Lantsman Acupuncture to commence operations at the Jamaica Avenue Clinic, alongside other professional corporations that the Management Defendants controlled.

197. Lantsman was no longer the true shareholder, director, or officer of Lantsman Acupuncture, and no longer had any true ownership interest in or control over the professional corporation.

198. Subsequent to the purchase of Lantsman's acupuncture license, true ownership and control over Lantsman Acupuncture always rested entirely with the Management Defendants, who used the façade of Lantsman Acupuncture to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

199. Subsequent to the purchase of his acupuncture license by the Management Defendants, Lantsman exercised absolutely no control over or ownership interest in Lantsman Acupuncture.

200. All decision-making authority relating to the operation and management of Lantsman Acupuncture was vested entirely with the Management Defendants.

201. In addition, subsequent to the purchase of his acupuncture license by the Management Defendants, Lantsman did not control or maintain any of Lantsman Acupuncture's

books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Lantsman Acupuncture's financial affairs; never hired or supervised any of Lantsman Acupuncture's employees or independent contractors; and was unaware of fundamental aspects of how Lantsman Acupuncture operated.

202. In reality, Lantsman was never anything more than a de facto employee of the Management Defendants.

203. In late 2015, Lantsman and Lantsman ceased their operations at the Jamaica Avenue Clinic.

### 7. The Purchase of Yumi's Acupuncture License and Ownership of Yumi Acupuncture

204. In late 2015 in order to replace Lantsman Acupuncture, the Management Defendants recruited Yumi, a licensed acupuncturist who was willing to sell them the use of her acupuncture license so that they could fraudulently incorporate Yumi Acupuncture.

205. Yumi Acupuncture was fraudulently incorporated on August 20, 2015, and nominally is owned on paper by Yumi, but in actuality always has been owned and controlled by the unlicensed non-medical professionals in contravention of New York law.

206. In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Yumi, wherein, in exchange for a designated salary or other form of compensation, Yumi agreed to falsely represent in the certificate of incorporation and related filings with New York State, that she was the true shareholder, director, and officer of Yumi Acupuncture and that she truly owned, controlled, and practiced through the professional corporation.

207. Yumi agreed to falsely represent in the certificate of incorporation and related filings with New York State that he continued to be the true shareholder, director, and officer of Yumi Acupuncture and that he truly owned, controlled, and practiced through the professional corporation, knowing that the professional corporation would be used to submit fraudulent billing to insurers.

208. The Management Defendants – rather than Yumi – provided all costs associated with establishing Yumi Acupuncture in the Jamaica Avenue Clinic, and all investment in Yumi Acupuncture subsequent to the purchase of Yumi's acupuncture license by the Management Defendants in late 2015.

209. Yumi did not incur any costs to establish Yumi Acupuncture's practice at the Jamaica Avenue Clinic, nor did she invest any money in the professional corporation she purportedly owned subsequent to the purchase of her acupuncture license by the Management Defendants.

210. Thereafter, the Management Defendants caused Yumi Acupuncture to commence operations at the Jamaica Avenue Clinic, alongside other professional corporations that the Management Defendants controlled.

211. Yumi was no longer the true shareholder, director, or officer of Yumi Acupuncture, and no longer had any true ownership interest in or control over the professional corporation.

212. Subsequent to the purchase of Yumi's acupuncture license, true ownership and control over Yumi Acupuncture always rested entirely with the Management Defendants, who used the façade of Yumi Acupuncture to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

213. Subsequent to the purchase of his acupuncture license by the Management Defendants, Yumi exercised absolutely no control over or ownership interest in Yumi Acupuncture.

214. All decision-making authority relating to the operation and management of Yumi Acupuncture was vested entirely with the Management Defendants.

215. In addition, subsequent to the purchase of his acupuncture license by the Management Defendants, Yumi did not control or maintain any of Yumi Acupuncture's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Yumi Acupuncture's financial affairs; never hired or supervised any of Yumi Acupuncture's employees or independent contractors; and was unaware of fundamental aspects of how Yumi Acupuncture operated.

216. In reality, Yumi was never anything more than a de facto employee of the Management Defendants.

217. In mid-2016, Yumi Acupuncture ceased its operations at the Jamaica Avenue Clinic.

**8. The Purchase of Meng's Acupuncture License and Ownership of MZ Acupuncture**

218. In mid-2016, in order to replace Yumi Acupuncture, the Management Defendants recruited Meng, a licensed acupuncturist who was willing to sell them the use of his acupuncture license as well as complete ownership and control of MZ Acupuncture, a preexisting acupuncture professional corporation formed by Meng in 2014.

219. In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Meng, wherein, in exchange for a designated salary or other form of

compensation, Meng agreed to falsely represent in the certificate of incorporation and related filings with New York State, that he was the true shareholder, director, and officer of MZ Acupuncture and that he truly owned, controlled, and practiced through the professional corporation.

220. Meng agreed to falsely represent in the certificate of incorporation and related filings with New York State that he continued to be the true shareholder, director, and officer of MZ Acupuncture and that he truly owned, controlled, and practiced through the professional corporation, knowing that the professional corporation would be used to submit fraudulent billing to insurers.

221. In fact, the mid-2016 agreement between Meng and the Management Defendants was not their first agreement of this kind. Meng and the Management Defendants previously entered into a similar arrangement, wherein Meng sold his acupuncture license and ownership of an acupuncture professional corporation to the Management Defendants in connection with their operation of a fraudulent clinic located at 102-06 Metropolitan Avenue, Forest Hills, New York.

222. The Management Defendants – rather than Meng – provided all costs associated with establishing MZ Acupuncture in the Jamaica Avenue Clinic, and all investment in MZ Acupuncture subsequent to the purchase of Meng's acupuncture license by the Management Defendants in mid-2016.

223. Meng did not incur any costs to establish MZ Acupuncture's practice at the Jamaica Avenue Clinic, nor did he invest any money in the professional corporation he purportedly owned subsequent to the purchase of his acupuncture license by the Management Defendants.

224. Thereafter, the Management Defendants caused MZ Acupuncture to commence operations at clinic locations that the Management Defendants controlled, including the Jamaica

Avenue Clinic, alongside other professional corporations that the Management Defendants controlled.

225. Meng was no longer the true shareholder, director, or officer of MZ Acupuncture, and no longer had any true ownership interest in or control over the professional corporation.

226. Subsequent to the purchase of Meng's acupuncture license, true ownership and control over MZ Acupuncture always rested entirely with the Management Defendants, who used the façade of MZ Acupuncture to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

227. Subsequent to the purchase of his acupuncture license by the Management Defendants, Meng exercised absolutely no control over or ownership interest in MZ Acupuncture.

228. All decision-making authority relating to the operation and management of MZ Acupuncture was vested entirely with the Management Defendants.

229. In addition, subsequent to the purchase of his acupuncture license by the Management Defendants, Meng did not control or maintain any of MZ Acupuncture's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of MZ Acupuncture's financial affairs; never hired or supervised any of MZ Acupuncture's employees or independent contractors; and was unaware of fundamental aspects of how MZ Acupuncture operated.

230. In reality, Meng was never anything more than a de facto employee of the Management Defendants.

### B. The Kickback Owner Defendants and the Use of the Provider Defendants under their names by the Management Defendants

231. In additional to illegally owning and controlling the Provider Defendants owned as

of record by the Nominal Owner Defendants, the Management Defendants entered into secret agreements with the Kickback Owner Defendants to have the Provider Defendants listed under the names of the Kickback Owner Defendants operate at the Jamaica Avenue Clinic and access the patient base of the Clinic under the control of the Management Defendants.

232. In exchange for the ability to generate fees from patient referrals, the Kickback Owner Defendants agreed to falsely represent that they remained in control of the professional corporations listed under their names, specifically Brooklyn Precision, Shore Parkway, and Opus Psychological, in exchange for access to patients at the Jamaica Avenue Clinic, while these professional corporations operated at the Jamaica Avenue Medical Clinic.

233. The secret agreements among the Management Defendants and the Kickback Owner Defendants required the Kickback Owner Defendants to pay kickbacks and/or split fees with the Management Defendants. Specifically, in exchange for monetary payments disguised as operating or other legitimate expenses, such as rent or billing services, the Management Defendants caused Insureds at the Jamaica Avenue Clinic to be automatically referred to the Provider Defendants listed under the names of the Kickback Owner Defendants, regardless of the Insureds' actual symptoms or the necessity for mental health services.

234. The Management Defendants thereafter controlled the type, nature and frequency of services rendered by the Provider Defendants listed under the names of the Kickback Owner Defendants, and directed the referral and "passing around" of the Insureds among the different providers operating at the Jamaica Avenue Clinic pursuant to a predetermined treatment protocol.

235. The Kickback Owner Defendants did not market the existence of the Provider Defendants to the general public, did not advertise for patients, never sought to build name recognition to draw legitimate business, and did virtually nothing that would be expected of

legitimate healthcare professional corporations to develop their reputations and attract patients to the Provider Defendants at the Jamaica Avenue Clinic.

236. The kickbacks that the Kickback Owner Defendants paid to the Management Defendants were sometimes disguised as ostensibly legitimate fees to "rent" space from the Clinic or to pay for billing services. In actuality, these were "pay-to-play" arrangements by which the Management Defendants steered Insureds to the Provider Defendants and allowed the Provider Defendants to operate at the Jamaica Avenue Clinic. The amount of the "fees" was based upon the volume of Insureds that were expected to be referred to the Provider Defendants listed under the names of the Kickback Owner Defendants.

237. Though the Kickback Owner Defendants were listed as the owners of record of the Provider Defendants, they exercised no legitimate medical judgment in connection with the Provider Defendants' operations at the Jamaica Medical Clinic.

238. Though the Kickback Owner Defendants were listed as the owners of record of the Provider Defendants, they had no control over the care and treatment of the patients, as the patients were "passed around" among the different providers operating at the Jamaica Avenue Clinic pursuant to the predetermined treatment protocol implement by the Management Defendant.

239. Though the Kickback Owner Defendants were listed as the owners of record of the Provider Defendants, they exercised no control over the profits that were generated in connection with the Provider Defendants' operations at the Jamaica Avenue Clinic, as the Kickback Owner Defendants' ability to provide services and produce profit was dependent on the Management Defendants' cultivation of the patient base and operation of the Provider Defendants' at the Clinic.

### C. The Management Defendants' Efforts to Conceal Their Ownership and/or Control of the Provider Defendants

#### 1. The Sham Leases and "Licensing Agreements"

240. The Management Defendants leased the Jamaica Avenue Clinic location for the sole purpose of illegally owning, operating, and controlling medical professional corporations, including the Provider Defendants, as part of a fraudulent scheme.

241. In keeping with the fact that the Management Defendants controlled the Jamaica Avenue Clinic, the phone number on the awning outside of the Clinic was registered to VO Marketing.

242. The phone number appearing on the awning outside of the clinic and registered to VO Marketing was also the phone number used by El Sayed and Moon Rehab.

243. As part of their overall fraudulent scheme, and in an effort to give the Provider Defendants the veneer of legitimacy, the Management Defendants entered into sham licensing agreements with the Provider Defendants, via the Nominal Owner Defendants and the Kickback Owner Defendants.

244. Under the terms of the licensing agreements, the Provider Defendants agreed to pay the Management Defendants a monthly rent or "licensing" fee to operate out of the Jamaica Avenue Clinic.

245. In reality, however, the lease and licensing agreements served only as façades behind which the Provider Defendants could hide the siphoning of monies to the Management Defendants and/or the kickbacks that were paid to the Management Defendants.

246. For example, El Sayed and Moon Rehab entered into a "licensing agreement" with Olshansky and VO Marketing. In keeping with the fact that the licensing agreement was phony, El Sayed and Moon Rehab did not make regular monthly payments to Olshansky and VO

Marketing. Instead, El Sayed and Moon Rehab paid Olshansky and VO Marketing on a seemingly random basis for amounts in gross excess of the amounts payable under the Licensing Agreement.

247. In fact, between July and December 2015, El Sayed and Moon Rehab made at least nine separate payments to Olshansky and VO Marketing for a total of at least $73,000.00. These payments ranged from $1,000.00 to $11,000.00.

248. The lease and licensing agreements were intended to further disguise the fact that the (i) Management Defendants owned and controlled the Provider Defendants rather than the Nominal Owner Defendants and/or (ii) the Provider Defendants made unlawful kickback payments and/or payments for referrals to the Management Defendants.

249. The agreements were a sham in that the Provider Defendants' operations at the Jamaica Avenue Clinic began and terminated without regard for the temporal terms of the agreements, which were never actually enforced by either party because they knew the agreements were shams.

250. For example, in May 2016, Meng and MZ Acupuncture entered into a one year lease agreement with Potiha and Total Healthcare. Then, in August 2016 – just three months after the May lease with Potiha and Total Healthcare – Meng and MZ Acupuncture was directed to sign an entirely different lease agreement, this time with Lazarev and City Med.

251. The agreements existed solely to create the appearance of a legitimate licensor/licensee or lessor/lessee relationship between VO Marketing and the Provider Defendants.

252. In addition to the agreements with the Provider Defendants, the Management Defendants also caused VO Marketing to enter into agreements with other providers operating out of the clinic.

253. These agreements were similarly intended to disguise the fact that the Management Defendants controlled all the providers operating out of the Jamaica Avenue Clinic and/or received unlawful kickback payments from them.

254. Nevertheless, these agreements actually evidenced the Management Defendants' ownership and control of the providers operating out of the Jamaica Avenue Clinic and the payments of kickbacks.

255. Moreover, to the extent that the Management Defendants received monies from the Provider Defendants pursuant to the purported agreements, the Management Defendants used those agreements to disguise the fact that they were receiving unlawful kickbacks from the Provider Defendants and/or siphoning to themselves the profits that were generated by the billings submitted to Liberty Mutual and other insurers through the Provider Defendants.

**2. The Sham Management, Billing, and/or Marketing Agreements**

256. To further conceal their true ownership and control of the Provider Defendants while simultaneously effectuating pervasive, total control over their operation and management, the Management Defendants also arranged to have certain of the Provider Defendants enter into a series of "management", "billing", and/or "marketing" agreements.

257. These agreements called for exorbitant payments from the Provider Defendants to the Management Defendants, purportedly for the performance of certain designated services including management, marketing, billing, and/or collections, regardless of the actual value of the services provided.

258. While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "collection" and/or "marketing" services, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the Provider

Defendants; and (ii) to siphon the profits that were generated by the billings submitted to Liberty Mutual and other insurers through the Provider Defendants.

259. The net effect of these "management", "billing", and/or "marketing" agreements between the Provider Defendants and the Management Defendants was to maintain the Provider Defendants in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporations, their accounts receivable, and any revenues that might be generated therefrom.

**D. The Defendants' Fraudulent Treatment and Billing Protocol**

260. The Management Defendants' unlawful ownership and/or control of the Provider Defendants compromised patient care, because the provision of health services through the Provider Defendants was entirely subject to the pecuniary interests of the unlicensed, layperson Management Defendants, not the independent medical judgment of true medical professional-owners.

261. At the Jamaica Avenue Clinic, the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a predetermined, fraudulent protocol designed by the Management Defendants to maximize the billing that could be submitted through the Provider Defendants to insurers, including Liberty Mutual, rather than to truly treat or otherwise benefit the Insureds who purportedly were subjected to it.

262. The Defendants purported to provide their predetermined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentation, or the actual medical needs of the Insureds.

263. Each step in the fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and

thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

264. As an initial step in the Defendants' fraudulent scheme, virtually every Insured was subjected to a putative initial examination by a medical doctor.

265. Typically, Howell through Kingston Medical, or Dublin through BD Medical, (the "Examination Providers") purported to provide the initial examinations and subsequent follow-up examinations.

266. As part of the initial examination, each Insured was diagnosed with conditioned that varied little and which invariably led to voluminous and excessive physical therapy, chiropractic, acupuncture, psychological treatment, and/or diagnostic testing.

267. Following the putative initial examinations, the Examination Providers directed virtually every Insured to return to the Provider Defendants several times per week for follow-up examinations, outcome assessment testing, physical therapy, acupuncture, chiropractic services, psychological treatment and/or diagnostic testing, based on boilerplate diagnoses.

268. Similarly, following the putative follow-up examinations, the Examination Providers (i) used substantially similar template forms for their follow-up examination reports; (ii) offered substantially similar boilerplate diagnoses of back sprain/strain; and (iii) offered boilerplate referrals to the other treating providers at the Jamaica Avenue Clinic.

**1. The Fraudulent Initial Examinations**

269. After the drivers delivered an Insured to the Jamaica Avenue Clinic, the Defendants purported to provide virtually every Insured with an initial examination.

270. As part of the initial examination, each Insured was diagnosed with conditions that varied little and which invariably led to voluminous and excessive physical therapy, chiropractic, acupuncture, psychological treatment, and/or diagnostic testing.

271. Typically, Howell through Kingston Medical, or Dublin through BD Medical, (the "Examination Providers") purported to provide the initial examinations.

272. The Examination Providers and the Management Defendants typically billed the initial examinations to Liberty Mutual under current procedural terminology ("CPT") code 99205, representing a 60-minute evaluation, typically resulting in a charge of $200.68.

273. The charges for the initial examinations were fraudulent in that the examinations were performed pursuant to the fraudulent treatment protocol established by the Management Defendants.

274. Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the nature and extent of the initial examinations.

275. Under the New York Workers' Compensation Medical Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT code 99205 typically requires that the Insured present with problems of moderate-to-high severity.

276. Though the Defendants routinely billed for the initial examinations under CPT code 99205, the Insureds almost never presented with problems of moderate-to-high severity.

277. Even so, as set forth above, the Examination Providers directed virtually every Insured to return to the Provider Defendants several times per week for follow-up examinations, physical therapy, acupuncture, chiropractic services, psychological treatment and/or diagnostic testing, based on boilerplate diagnoses.

278. Furthermore, the use of CPT code 99205 typically requires that the physician spend 60 minutes of face-to-face time with the Insured or the Insured's family.

279. Neither Howell, Dublin, nor any other licensed healthcare provider associated with the Examination Providers, ever spent 60 minutes of face-to-face time with the Insured or the Insured's family on an initial examination.

280. In keeping with the fact that the Examination Providers never spent 60 minutes of face-to-face time with the Insureds, the Examination Providers used boilerplate, checklist examination forms when conducting the putative examinations, none of which would require a physician to spend 60 minutes with the examinee.

281. In keeping with the fact that Provider Defendants were owned and controlled by the Management Defendants and that the initial examinations were performed pursuant to the dictates of the Management Defendants, the Examination Providers (i) used substantially similar template forms for their initial examination reports; (ii) offered substantially similar boilerplate diagnoses of back sprain/strain; and (iii) offered boilerplate referrals to the other treating providers at the Jamaica Avenue Clinic.

**2. The Fraudulent Psychological Treatment**

282. As part of the fraudulent treatment protocol and the Management Defendants' kickback scheme with the Kickback Defendants, many Insureds were subjected to medically unnecessary psychological treatment.

283. Specifically, Dublin, BD Medical, Howell, and Kingston Medical referred many Insureds to Uchendu and Opus Psychological, despite the fact that the vast majority of these Insureds were not suffering from ailments that would require psychological treatments.

284. The fraudulent psychology protocol consisted of diagnostic interview examinations, record evaluations, individual psychotherapy, and cognitive skills training.

285. The psychological treatment was purportedly performed by Uchendu through Opus Psychological.

286. Like the Defendants' charges for the other Fraudulent Services, the charges for psychological treatment were fraudulent in that the treatment was medically unnecessary; was

supported by fabricated and nonsensical findings and reports; and was performed pursuant to the dictates of the Management Defendants, not to treat or otherwise benefit the Insureds.

**a. The Fraudulent Diagnostic Interview Examinations**

287. The first element of Defendants' fraudulent psychological treatment protocol included a "diagnostic interview examination" and "record evaluation."

288. The diagnostic interview examination was billed to Liberty Mutual under CPT code 90801, resulting in a charge of $179.07.

289. The diagnostic interview examinations were fraudulent inasmuch as they were medically unnecessary and were conducted pursuant to the dictates of the Management Defendants, not to treat or otherwise benefit the Insureds.

290. Each purported diagnostic interview examination was preceded by the subject Insured's completion of a "Authorization For of Self Referral for Psychological Testing/Psychotherapy." These checklist forms were provided to every patient purportedly subjected to psychological treatment/testing at the Jamaica Avenue Clinic.

291. The "authorization" forms contained a list of putative symptoms from which the Insured could chose, purportedly to assist the examiner in diagnosing the Insured. In reality, this checklist form did not – and could not – provide any clinically-significant evidence of the patient's psychological ailments.

292. For example, while the checklist form included symptoms such as "increased nervousness", "irritability", and "headaches", the form contained no information as to the severity or frequency of these ailments, nor any mention of what – if any – functional impact these putative symptoms had on the Insured's daily life and activities.

293. Moreover, these checklist forms were provided to Insureds not because they had indicated to anyone at the Clinic that they were suffering from potential psychological

symptoms, but instead were provided to virtually every patient that treated at the Jamaica Avenue Clinic, regardless of their individual circumstances.

294. Nonetheless, these checklist forms served as the only putative basis upon which Uchendu and Opus Psychological based their "Narrative Psychological Reports", to the extent said reports were based on anything at all.

295. Virtually every diagnostic interview examination resulted in a verbatim "Narrative Psychiatric Report."

296. Furthermore, the "Narrative Reports" generated by Uchendu and Opus Psychological contained verbatim descriptions of the Insureds symptoms and presentation and verbatim treatment plans consisting of boilerplate language that was cut-and-pasted from one Insured's report into the reports of nearly every other Insured, without regard for each Insured's individual symptoms or presentation.

297. For example, virtually every "Mental Status Examination" included the following identical language:

(i) Memory: "Patient's short term memory appears moderately impaired (impairments were evidenced in simple computational skills (seven digit forward and seven digit backward was checked). Long term memory appears moderately impaired."

(ii) Mood: "patient reports feeling anxious, depressed, angry, frightened."

298. Similarly, virtually every diagnostic report included the following language with respect to a purported examination of "Interpersonal Relationships and Socialization":

(i) "Patient acknowledges having tendency to isolate socially"

(ii) "increased amount of interpersonal conflicts at home"

299. Along similar lines, virtually every diagnostic report included a diagnosis of "Post Concussional Disorder", with each patient putatively suffering from the following identical symptoms:

> Unremitting headache daily, vertigo or dizziness, anxiety, depression, or affective lability, posttraumatic amnesia, disordered sleep, becoming fatigued easily, irritability or aggression on little or no provocation....

300. Finally, virtually every report concluded with the following language regarding "considerations and recommendations affecting plan of care":

> I am inclined to believe that you are experiencing negative effects associated with an involvement in a motor vehicle accident. At the present time your coping abilities do not appear to be effective in dealing with the emotional aftermath of the accident. Your responses during the interview and testing indicated acknowledgement of important problems and perception of a need for help in dealing with these problems. You report a positive attitude toward a possibility of personal change, the value of treatment, and the importance of personal responsibility. In addition, you report a number of other strengths that are positive indicators for relatively smooth treatment process and a reasonably good prognosis. Due to a relatively short time between this evaluation and the motor vehicle accident, all findings should be interpreted with caution. The symptoms discussed may either not persist over an extensive period of time or may exacerbate in intensity. Additionally, new symptoms may manifest after a period of time. If in case these factors and background history elicited throughout the initial interview will suggest treatment (consult your primary physician about results of our evaluation), I would like you to know the information mentioned below. This should assist you with making an intelligent decision about whether you should pursue psychological treatment at this time or not.

301. It is implausible, if not impossible, that virtually every Insured that the Defendants purported to treat suffered from substantially the same symptoms.

302. Based upon these copy-and-pasted narrative reports, Uchendu and Opus Psychological provided boilerplate, predetermined diagnoses of Adjustment Disorder, Mood Disorder, Acute Stress Disorder, or Posttraumatic Stress Disorder to virtually every Insured they purported to treat.

303. Not only did the Defendants submit fraudulent billing for the diagnostic interview examinations, they also "unbundled" the charges in virtually every instance in order to maximize the fraudulent billing they could submit, or cause to be submitted, to Liberty Mutual.

**b. The Fraudulent "Psychological Testing" Charges**

304. Based upon the fraudulent, pre-determined outcome of the diagnostic interview examinations/psychotherapy sessions, and the phony "acute stress disorder," "adjustment disorder," and "anxiety disorder" diagnoses, Uchendu and Opus Psychological also purported to provide a battery of medically and psychologically useless psychological tests to Insureds.

305. Uchendu and Opus Psychological charged Liberty for the psychological testing under CPT code 96101, virtually always six hours of testing at a rate of $169.92 per hour. This typically resulted in a total charge of $1,019.52 for a single session of psychological tests per Insured.

306. The psychological testing was fraudulent inasmuch as it was medically and psychologically unnecessary, and was conducted, to the extent that it was conducted at all, pursuant to a pre-determined, fraudulent treatment protocol. Moreover, the psychological testing was fraudulent inasmuch as it was the product of illegal kickback arrangement between the Kickback Defendants and the Management Defendants, not pursuant to the documented and clinically-reasonable needs of the Insureds, or to benefit the Insureds who were supposedly subjected to it.

307. In keeping with this fraudulent treatment protocol, Uchendu and Opus Psychological purported to provide an identical battery of psychological tests to virtually every Insured, without regard for the Insureds' individual circumstances. Specifically, Uchendu and Opus Psychological purported to provide virtually every Insured with the following identical battery of psychological tests:

(i) Beck Hopelessness Scale;

(ii) Back Anxiety Inventory;

(iii) Beck Depression Inventory;

(iv) Patient Pain Profile;

(v) Nero-Psychological Symptom Checklist; and

(vi) Mental status examination.

308. These tests are nothing more than a handful of pre-printed checklists and brief screening instruments that were filled out by the Insureds or the Defendants, on which check-marks were placed next to the psychological symptoms the Insureds purportedly experienced. However, the Uchendu and Opus Psychological already took a detailed symptomatology from each Insured during the diagnostic interview examinations/psychotherapy sessions, which preceded the testing – to the limited extent that any of these procedures actually were performed at all. Accordingly, the tests were duplicative, unnecessary, and were provided – to the extent provided at all – solely to enrich the Defendants, not to benefit the Insureds who were subjected to them.

309. Furthermore, the Defendants' charges for the psychological testing were fraudulent because – notwithstanding the Defendants' misrepresentations that the tests virtually always took three to five hours to perform – the tests never took more than one hour to administer, score, and interpret, to the extent that they were performed in the first instance.

310. The Defendants' purported use of psychological tests – to the extent that they actually provided the tests in the first instance – stands in marked contrast to the standard of care in basic, legitimate psychological practice.

311. For instance, under generally accepted standards and practices, a diagnostic interview examination alone should be sufficiently comprehensive to address all of the issues

discernable from the types of self-reported psychological tests that Uchendu and Opus Psychological purported to provide. Psychological testing of the kind allegedly administered by Uchendu and Opus Psychological is only medically or psychologically necessary when a diagnosis is not evident from a diagnostic interview and the psychological testing will yield relevant additional clinical data beyond that obtained through the diagnostic interview.

312. However, the diagnostic interview examinations that Uchendu and Opus Psychological purported to provide did, in fact, yielded sufficient clinical data to provide a diagnosis. In fact, Uchendu and Opus Psychological actually did purport to provide diagnoses – albeit false ones - at the conclusion of each diagnostic interview examination.

313. Uchendu and Opus Psychological's charges for the psychological testing also were fraudulent in that the use of CPT code 96101 represented that the psychologists administering the psychological tests have prepared a written report interpreting the test results. Though Uchendu and Opus Psychological routinely billed for the psychological tests under CPT code 96101, and though Uchendu and Opus Psychological submitted what purported to be interpretive test reports in support of their billing, neither Uchendu, nor any other psychologists associated with Opus Psychological ever prepared any genuine written reports interpreting the test results.

314. Rather, Uchendu and Opus Psychological simply cobbled the psychological testing reports together using boilerplate language from pre-existing reports, without any interpretive input from Uchendu or any other psychologists.

315. In keeping with the fact that these "reports" – as well as the underlying psychological tests – were fraudulent, Uchendu and Opus Psychological simply reiterated the boilerplate, predetermined diagnoses of Adjustment Disorder, Mood Disorder, Acute Stress

Disorder, or Posttraumatic Stress Disorder that they had included in their initial diagnostic report.

316. Moreover, each boilerplate psychological testing "report" indicated that the Insured suffered from "Post Concussional Disorder", regardless of the Insured's true circumstances or symptomology. In fact, many of the Insureds reported suffering no head injuries whatsoever.

317. Similarly, each "report" generated by Uchendu and Opus Psychological contained a fabricated Global Assessment of Functioning Scale ("GAF") score. This assessment results in rating between zero and 100, with higher ratings indicating better functioning. Scores ranging from 41-50 are associated with "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting.)."

318. In further keeping with the fact that the psychological testing was medially and psychologically unnecessary, virtually all of the reports generated by Uchendu and Opus Psychological fraudulently indicated that the Insured scored between 41 and 50 on the GAF scale, regardless of the Insured's true circumstances or symptomology.

**3. The Fraudulent Chiropractic Treatment**

319. As part of the fraudulent treatment protocol instituted by the Management Defendants, Apple Chiropractic, Collins, Alpine Chiropractic, and Benoit (the "Chiropractic Defendants") purported to subject many Insureds to a series of chiropractic treatments.

320. Like the Defendants' charges for the other Fraudulent Services, the charges for chiropractic treatment were fraudulent in that the chiropractic treatment was performed pursuant to the dictates of the Management Defendants, not to treat or otherwise benefit the Insureds.

321. Between April 2015 and April 2016, Collins and Apple Chiropractic operated at the direction of the Management Defendants at the Jamaica Avenue Clinic. In January 2016,

Benoit and Alpine Chiropractic began operating at the Jamaica Avenue Clinic. However, there was never a shift or change in the provision of or billing for the chiropractic services putatively provided at the Jamaica Avenue Clinic.

322. Despite Apple Chiropractic and Alpine Chiropractic putatively being separately owned and operated chiropractic professional corporations, they were at all times truly owned and controlled by the Management Defendants.

323. In keeping with the fact that the Chiropractic Defendants were controlled by the Management Defendants, Apple Chiropractic and Apple Chiropractic operated in identical fashion. Both Apple Chiropractic and Alpine Chiropractic billed under identical CPT codes, including 99202, 98941, 97112, 97139, and 99212. Moreover, the Management Defendants submitted charges in identical amounts under these CPT codes through Apple Chiropractic and Alpine Chiropractic.

**4. The Fraudulent Acupuncture Treatment**

324. As part of the fraudulent treatment protocol instituted by the Management Defendants, Yumi, Yumi Acupuncture, Meng, MZ Acupuncture, Lantsman, and Lantsman Acupuncture (the "Acupuncture Defendants") purported to subject many Insureds to acupuncture treatment, but did so solely to maximize the billing submitted to insurers, without regard to the medical necessity of the services or the requirements for proper billing under New York's No-Fault Laws.

325. In furtherance of the Defendants' fraudulent scheme, every Insured who was referred for acupuncture treatment was provided with treatment pursuant to a predetermined, fraudulent protocol.

326. This predetermined, fraudulent protocol was grounded on fabricated exams and reports used to support excessive and medically unnecessary acupuncture services not warranted by the patients' conditions.

**a. Legitimate Acupuncture Practices**

327. Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows. Every individual has a unique energy flow ("Chi").

328. When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

329. The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity.

330. The first step in any legitimate acupuncture treatment is a physical examination of the patient.

331. A component of this examination includes examination of the appearance of the patient's tongue (i.e., color, shape, texture, etc.) and various measurements of the patient's pulse (i.e., rate, rhythm, strength, etc.).

332. The information gleaned from these elements of the physical examination assists with the diagnosis of the patient's condition and thereby helps develop an acupuncture treatment plan designed to benefit the patient by restoring his unique Chi.

333. In cases involving trauma, an actual physical examination also is appropriate to identify the location of the injury and consequent pain and – by extension – to identify the Meridians, if any, that have been disrupted.

334. The second step in any legitimate acupuncture treatment is the development of an acupuncture treatment plan.

335. In developing a legitimate treatment plan, an acupuncturist will consider both the injuries sustained by the patient, as well as the tongue and pulse information obtained during the physical examination.

336. Using this information, the acupuncturist will identify a unique, cohesive, and individualized set of Acupuncture Points into which needles can be inserted or pressure can be applied to restore the patient's Chi and address the patient's discrete injuries.

337. In developing a legitimate acupuncture treatment plan, an acupuncturist must choose from at least 360 discrete Acupuncture Points.

338. The third step in any legitimate acupuncture treatment is the implementation of the acupuncture treatment plan.

339. If legitimately performed, this step will include the use of both "local" Acupuncture Points (i.e., points near the affected areas of the relevant Meridian), and "distal" Acupuncture Points (i.e., points that are distant from the affected areas of the relevant Meridian), and typically will involve insertion of between 10 and 20 acupuncture needles into between five and 10 Acupuncture Points.

340. Within these parameters, the number and location of the Acupuncture Points generally will vary based upon the unique circumstances presented by each patient as well as each patient's individual therapeutic response to each acupuncture treatment.

341. Any legitimate acupuncture treatment plan may permit up to four treatment sessions for the first two weeks of treatment.

342. After this initial stage, the weekly treatment sessions typically should decrease, leaving more time between treatments to assess how long the patient remains pain-free between treatments and/or how long the therapeutic effect of such treatments can be maintained between treatments.

343. Any legitimate acupuncture treatment plan requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments.

344. Acupuncture treatment plans are fluid and evolve over time.

345. Therefore, the goal of any legitimate acupuncture treatment plan is to make appropriate adjustments as treatment progresses in order to improve the therapeutic effectiveness of each treatment, and eventually to return the patient to maximum health by restoring his or her unique energy flow.

346. Any legitimate acupuncture treatment requires meaningful documentation of the: (i) physical examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) the patient's progress throughout the course of treatment.

**b. The Acupuncture Defendants' Fraudulent Initial Examinations**

347. The Acupuncture Defendants purported to begin treatment of nearly every Insured with an initial examination which was billed through Lantsman Acupuncture, Yumi Acupuncture, and MZ Acupuncture.

348. The charges for the initial examinations were fraudulent in that the examinations were performed pursuant to the dictates of the Management Defendants, not to treat or otherwise benefit the Insureds.

349. Upon presentment of an Insured, the acupuncturists associated with the Acupuncture Defendants routinely purported to perform an initial acupuncture examination.

350. The initial acupuncture examinations were performed as the "gateway", in order to document Insureds as having phony, pre-determined "diagnoses" to allow the performance of a course of unnecessary, illusory, or otherwise unreimbursable acupuncture treatments.

351. More specifically, the Acupuncture Defendants routinely purported to begin treatment of the Insureds with an initial acupuncture examination that was billed under CPT codes 99203 and 99204. The charges for the initial acupuncture examinations were fraudulent in that the examinations (i) were medically unnecessary; (ii) performed as part of the fraudulent treatment protocol and illegal financial arrangements between the Defendants, and (iii) misrepresented the nature and extent of the initial acupuncture examinations.

352. While the initial acupuncture examinations were routinely billed to Liberty Mutual using CPT code 99203, which typically requires that the practitioner spend 30 minutes of face-to-face time with the Insured or the Insured's family, no acupuncturist associated with the Acupuncture Defendants ever spent 15 minutes of face-to-face time with the Insureds or their families during the initial acupuncture examinations, much less 30 minutes.

353. While the initial acupuncture examinations were routinely billed to Liberty Mutual using CPT code 99204, which typically requires that the practitioner spend 45 minutes of face-to-face time with the Insured or the Insured's family, no acupuncturist associated with the Acupuncture Defendants ever spent 15 minutes of face-to-face time with the Insureds or their families during the initial acupuncture examinations, much less 45 minutes.

354. In keeping with the fact that that the initial examinations were provided pursuant to the Defendants' fraudulent treatment protocol and under the direction and control of the

Management Defendants, the examinations reports submitted to Liberty Mutual through MZ Acupuncture virtually all contained the same "diagnosis" and "recommendations."

355. For instance, virtually every initial examination report submitted through MZ Acupuncture contained the following verbatim language,:

> This patient displays active symptomology and suffers from recurrent exacerbations of symptoms. The patient's lymphatic and blood circulation are impaired due to the extreme physical and mental stress of the accident. The patient presents a sensation of generalized pain.

356. Moreover, virtually every initial examination report submitted through Yumi Acupuncture, MZ Acupuncture, and Lantsman Acupuncture contained a treatment plan that included both local and distal point treatments. In reality, however, the Acupuncture Defendants never utilized distal points in their putative treatment of their patients, but instead utilized virtually identical local points to practically every Insured they purported to treat at the Jamaica Avenue Clinic.

**c. The Acupuncture Defendants' Fraudulent Acupuncture Treatments**

357. Following the fraudulent initial examinations, the Acupuncture Defendants purported to provide acupuncture treatments, the bills for which typically consisted of: (i) charges for one unit of acupuncture treatment using code 97810, typically resulting in a charge of $35.00, and at least two additional units of acupuncture treatment using treatment code 97811, typically resulting in charges of $30.00 apiece; or (ii) charges for one unit of acupuncture treatment using code 97813, typically resulting in a charge of $32.87, and at least two additional units of acupuncture treatment using code 97814, typically resulting in charges of $28.56 apiece.

358. The purported "acupuncture" services provided by the Acupuncture Defendants did not remotely comport with any of the aforesaid basic, legitimate acupuncture requirements.

359. All patients were treated with repetitive and virtually identical point prescriptions, without regard to any necessary individual treatment strategies, without regard to any necessary adjustments in treatment as treatment progresses over time, and without meaningful, genuine, and individualized documentation.

360. At best, the purported "acupuncture" services provided by the Acupuncture Defendants consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insured's condition and were not designed to effectively treat or otherwise benefit the Insureds.

361. The services billed for by the Acupuncture Defendants also reflect a lack of independent professional acupuncture judgment and instead reflect a predetermined protocol designed to enrich the Defendants through the submission of fraudulent charges to Liberty Mutual and other insurers.

362. For instance, the number of needles used were often insufficient; the number and location of acupuncture points used were insufficient to justify the number of units billed; and patients were universally getting a very high frequency of treatment sessions (3-4 per week for months) that was not supported by the alleged injuries and not adjusted to reflect the Insureds' improvement or lack thereof.

363. More specifically, the Acupuncture Defendants took steps in their putative treatment of Insureds to manufacture fraudulent billing opportunities to maximize their ill-gotten gains.

364. For example, in a legitimate clinical setting, an acupuncturist will place between 10 and 20 needles in the patient's back and neck for a single 15 to 20 minute session. However, in an attempt to maximize the fraudulent billing they could submit to insurers, including Liberty

Mutual, the Acupuncture Defendants falsely represented that their treatment required the removal and reinsertion of smaller numbers of needles.

365. In many of the claims submitted by the Acupuncture Defendants through Yumi Acupuncture, MZ Acupuncture, and Lantsman Acupuncture, the Acupuncture Defendants manufactured these reinsertion charges. Instead of inserting higher numbers of needles into the necks, shoulders, and backs of Insureds simultaneously – and submitting just a single charge under CPT codes 97810 or 97813 – the Acupuncture Defendants purported to insert between two and four needles at a time into most of the Insureds. Then, the Acupuncture Defendants purported to remove and reinsert the needles into entirely different areas on the Insureds, thereby creating a contrived opportunity to submit additional charges under CPT codes 97811 or 97814.

366. In virtually every case, all of the needles purportedly inserted into the Insureds in a given session by the Acupuncture Defendants could have been inserted at the same time.

**5. The Fraudulent Charges for Physical Performance Tests**

367. In addition to the other Fraudulent Services, Moon Rehab purported to provide Physical Performance Testing ("PPT") to Insureds.

368. As with the charges for the other Fraudulent Services, the charges for the PPT tests were fraudulent in that the tests were medically unnecessary and were performed pursuant to the fraudulent treatment protocol and were administered at the direction of the Management Defendants.

369. Like the Defendants' other charges, the outcome of the PPT tests was pre-determined for virtually every Insured in order to justify the billing and performance of the other Fraudulent Services. El Sayed and Moon Rehab (the "PPT Providers") purported to provide PPT tests to Insureds despite their actual knowledge that the PPT tests were medically unnecessary

and duplicative of the manual range of motion and muscle strength tests that were performed during every examination.

370. The only substantive difference between the PPT tests, and the manual range of motion and manual muscle strength tests purportedly provided by the PPT Providers during the initial and follow-up examinations, is that the PPT tests generate a digital printout of an Insured's range of motion and/or muscle strength. The range of motion and muscle strength data obtained through the use of the PPT tests are not significantly different from the information obtained through the manual testing that was part and parcel of the examinations purportedly provided by the Defendants to Insureds.

371. In keeping with the fact that the PPT tests were medically unnecessary and were performed pursuant to the Defendants' pre-determined fraudulent treatment protocol, the results of the PPT tests, like the other Fraudulent Services, were never incorporated into the Insureds' respective treatment plans.

**6. The Fraudulent Computerized Range of Motion**

372. In addition to the other Fraudulent Services, the Defendants subject Insureds to one or more sessions of medically useless computerized range of motion testing ("ROM") in an attempt to maximize the fraudulent billing submitted to Liberty Mutual.

373. Typically, El Sayed and Moon Rehab purported to provide ROM at the Jamaica Avenue Clinic.

374. El Sayed and the Management Defendants bill ROM to Liberty Mutual through Moon Rehab (the "ROM Defendants") under multiple units of CPT code 95851, generally resulting in a total charge of $518.20 for each session of ROM "testing."

375. The charges for the computerized range of motion tests are fraudulent in that the computerized range of motion tests are medically unnecessary and performed – to the extent that

they are performed at all – pursuant to the Management Defendants fraudulent treatment protocol.

**a. Traditional Tests to Evaluate the Human Body's Range of Motion**

376. The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety. The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

377. The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion." Stated in a more illustrative way, range of motion is the amount of movement at the joint.

378. A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement at the joint in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move at his or her joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

379. Physical examinations performed on patients with soft-tissue trauma necessarily require range of motion tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

380. Since range of motion tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion tests are to be reimbursed as an element of the examinations. In

other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided range of motion tests.

**b. The ROM Defendants' Duplicate Billing for Medically Unnecessary Computerized range of motion tests**

381. To the extent that the Examination Defendants actually provided the initial and follow-up examinations that are billed to Liberty Mutual, the Examination Defendants purportedly conducted manual range of motion tests on each Insured during the initial and follow-up examinations.

382. The charges for these manual range of motion tests are part and parcel of the charges that the Examination Defendants routinely submitted for the initial and follow-up examinations.

383. Despite the fact that Insureds already purportedly have undergone manual range of motion and muscle testing during their initial and follow-up examinations, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by Liberty Mutual as a component of reimbursement for the initial and follow-up examinations, the ROM Defendants systemically bill for, and purport to perform, computerized range of motion tests on Insureds.

384. The ROM Defendants often deliberately schedule separate appointments for computerized range of motion tests so that they could bill for those procedures separately, without having to include them in the billing for the initial and follow-up examinations, as required by the Fee Schedule.

385. The ROM Defendants purport to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies while the Insured was asked to attempt various motions and movements. The test is virtually identical to

the manual range of motion testing that is described above and that purportedly was performed during the initial and follow-up examinations, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

386. The ROM Defendants purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the Insured is asked to press multiple times using various muscle groups. As with the computerized range of motion tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial and follow-up examinations – except that a digital printout was obtained.

387. The information gained through the use of the computerized range of motion tests is not significantly different from the information obtained through the manual testing that is part and parcel of the Insured's examination. In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing is meaningless.

388. While ROM can be a medically useful tool as part of a research project, under the circumstances employed by the ROM Defendants it represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during virtually every Insured's initial and follow-up examinations.

389. The computerized range of motion tests are part and parcel of the ROM Defendants' interrelated fraudulent schemes, inasmuch as the "service" is rendered pursuant to a pre-established protocol that (i) amounts to purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during the Insureds'

initial and follow-up examinations; (ii) in no way aids in the assessment and treatment of the Insureds; and (iii) is designed solely to financially enrich the ROM Defendants.

**7. The Fraudulent Charges for VsNCT Testing**

390. As part of the fraudulent treatment protocol and the Management Defendants' kickback scheme with the Kickback Defendants, many Insureds were subjected to medically useless VsNCT testing at the Jamaica Avenue Clinic.

391. The medically useless VsNCT testing was purportedly provided by Mills through Brooklyn Precision or Fioriglio through Shore Parkway (collectively, the "VsNCT Defendants").

392. Like the Defendants' charges for the other Fraudulent Services, the charges for psychological treatment were fraudulent in that the treatment was medically unnecessary; was supported by fabricated and nonsensical findings and reports; and was performed pursuant to the dictates of the Management Defendants, not to treat or otherwise benefit the Insureds.

**a. The Human Nervous System and Electrodiagnostic Testing**

393. The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

394. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

395. The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

396. Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

397. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A disease or dysfunction of the peripheral nerves is called a neuropathy, and can cause various symptoms including pain, numbness, and weakness.

398. VsNCT tests are a putative form of electrodiagnostic test, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathy.

399. The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies and radiculopathies.

400. The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

401. The Recommended Policy does not identify VsNCT tests as having any documented usefulness in diagnosing radiculopathies.

**b. Legitimate Tools for Neuropathy Diagnosis**

402. The Defendants supposedly provided the VsNCT tests to Insureds in order to diagnose abnormalities in the Insureds' peripheral nerves and/or spinal nerve roots.

403. There are four primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities in the peripheral nerves and/or spinal nerve roots. These diagnostic tests are nerve conduction velocity ("NCV") tests, electromyography ("EMG") tests, computed tomography scans ("CT scans"), and magnetic resonance imaging tests ("MRIs").

404. Except in very limited circumstances, for diagnostic purposes NCVs and EMGs are performed together if: (i) nerve damage is suspected following an auto accident; (ii) the damage cannot be fully evaluated through a physical examination or other generally accepted diagnostic technique; and (iii) the tests are necessary to determine an appropriate treatment plan.

405. MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and spinal nerve roots inside the human body. MRIs are often used following auto accidents to diagnose abnormalities in the spinal nerve roots through images of the spinal nerve roots and surrounding structures.

**c. The Medically Useless VsNCT Tests**

406. The VsNCT test is a type of perception threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots. They do not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

407. The VsNCT tests are performed by administering an electric current through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and/or face. The voltage is increased until the patient states that he or she perceives a sensation from the increased

stimulus. "Findings" then are made by comparing the minimum voltage required for the patient to announce that he or she perceives some sensation with purported normal ranges.

408. In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in VsNCT testing.

409. If the patient's sensation threshold is greater than the purported normal range of voltage required to evoke a perceived sensation, it allegedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function). If the voltage required for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a perceived sensation, it allegedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

410. Though the VsNCT Defendants purported to subject many Insureds to VsNCT tests, supposedly to diagnose neuropathies, the VsNCT tests were actually medically useless.

411. There are no legitimate data to support the use of VsNCT tests to diagnose neuropathies.

412. There is no reliable evidence of the existence of normal ranges of intensity or voltage required to evoke a perceived sensation using a VsNCT test device. Given the lack of evidence of normal ranges of intensity or voltage required to evoke a perceived sensation, it is impossible to determine whether any given Insured's personal VsNCT test results are abnormal or not.

413. Even if there was some evidence of the existence of normal ranges of intensity or voltage required to evoke a perceived sensation using a VsNCT test device, there is no reliable evidence to prove that a sensation threshold greater than the normal range would indicate a

hypoesthetic condition or that sensation threshold less than the normal range would indicate a hyperesthetic condition.

414. Even if an abnormal sensation threshold indicated either a hypoesthetic or hyperesthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from VsNCT tests. Indeed, there are numerous pathological and physiological conditions other than peripheral nerve damage that can cause hyperesthesia and hypoesthesia.

415. In keeping with the fact that the VsNCT Defendants' purported VsNCT tests were medically useless and incapable of identifying the specific location of abnormalities along the sensory nerve pathways, the "Electrodiagnostic Reports" generated by the Referral Sources never differentiated between peripheral neuropathies and radiculopathies. In fact, the VsNCT tests performed by the Defendants were incapable of differentiating between peripheral neuropathies and radiculopathies.

416. In further keeping with the fact that Defendants' purported VsNCT were medically useless, the Centers for Medicare & Medicaid Services ("CMS") have determined that VsNCT tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and are therefore not compensable.

417. In keeping with the fact that the VsNCT Defendants' putative VsNCT tests were medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for VsNCT tests.

418. To conceal the fact that they purported to provide medically useless VsNCT tests to Insureds, Brooklyn Precision and Mills virtually always billed for the VsNCT tests using CPT code 95904, a CPT code used for ostensibly medically-legitimate NCV testing.

419. Brooklyn Precision and Mills deliberately misrepresented the VsNCT tests as NCV tests because they knew that the VsNCT tests were medically useless and unreimbursable, yet nonetheless sought to recover payment for the VsNCT tests they purported to provide.

420. By contrast, Fioriglio and Shore Parkway billed the VsNCT tests to Liberty Mutual under CPT code 95999, a CPT reserved for "unlisted" procedures. However, both Brooklyn Precision and Shore Parkway's bills for the fraudulent VsNCT testing sought total reimbursement in the amount of $1,310.94, regardless of the underlying CPT codes.

421. In keeping with the fact that the purported VsNCT tests were medically useless, the putative "results" of the VsNCT Defendants' VsNCT tests were not incorporated into any Insured's treatment plan, and the VsNCT tests played no genuine role in the treatment or care of the Insureds.

422. What is more, the VsNCT Defendants often purported to perform VsNCT testing on Insureds who had already been subjected to MRI and/or NCV testing, which are, as established above, ostensibly legitimate means by which a practitioner could diagnose a neuropathy and/or radiculopathy. As such, the VsNCT testing was duplicative, as it could not have provided a healthcare practitioner with any medically-significant information that could not have been gleaned from the MRI and/or NCV results, to the extent the VsNCT testing could provide any medically useful information at all.

**d. Each of the Two Main VsNCT Test Device Manufacturers Claims the Other is a Fraud**

423. The two primary manufacturers of sensory nerve conduction threshold devices are Neurotron, Inc. and Neuro Diagnostic Associates. Neurotron, Inc. manufactures a device called the Neurometer. Neuro Diagnostic Associates manufactures a device called the Medi-Dx 7000.

424. To the extent that the Defendants actually provided any VsNCT tests to Insureds in the first instance, they were provided using either a Neurometer or Medi-Dx 7000 device. While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purports to provide quantitative data on sensory nerve conduction threshold.

425. However, Neuro Diagnostic Associates claims that the Neurometer does not produce valid data or results, and Neurotron, Inc. makes the same allegations regarding the Medi-Dx 7000. Annexed as Exhibit "4" is each manufacturer's challenge to the validity of the other manufacturer's sensory nerve conduction threshold device.

426. Among the charges made by Neurotron, Inc. against the Medi-Dx 7000 are that: (i) there is no reliable evidence that the type of electrical wave forms (asymmetrical wave forms) used by the Medi DX 7000 stimulate or provide any useful diagnostic information regarding any specific kind of sensory nerve fiber; (ii) the alternating output of electrical current used by the Medi-Dx 7000 is "severely distorted by skin impedance" (e.g., texture, thickness, temperature of the skin etc.) making it "impossible" to determine the true intensity levels of the electrical current being delivered by the Medi-Dx 7000; (iii) the Medi-Dx 7000 protocols are "incapable of measuring the thresholds in the sensory nerves"; and (iv) there are no peer-reviewed studies that validate the tests performed using the Medi-Dx 7000.

**e. The Phony VsNCT "Reports"**

427. In an attempt to create the illusion that a licensed healthcare provider had some role in the performance of the VsNCT tests, the Defendants created boilerplate VsNCT test "reports" that they submitted in support of their billing.

428. The "reports" generated by the VsNCT Defendants were not based on any professional or medical decision-making or analysis. Instead, virtually every report contained boilerplate, generic language not tailored to specific Insureds.

429. Specifically, the VsNCT reports each contained an identical, boilerplate "Diagnostic Summary" section that did not vary from patient-to-patient and was included solely to foster the illusion that a licensed healthcare professional had some role in performing or interpreting the tests.

430. For instance, virtually all of the putative lumbosacral VsNCT test reports generated by the VsNCT Defendants contained the following, identical "Diagnostic Summary":

> Higher amplitudes identify pathology with statistical sensitivity approaching 100%. Due to CNS interconnectivity sensory pathology influences conduction to adjacent nerves so correlation of the history and other findings is essential to differentiate secondary lesions, and is necessary before initiating or changing treatment. Lower than normal amplitudes correlate with irritation and may suggest possible adjacent inflammatory activity, which warrants investigation to rule in or out possible concomitant pathology. Normal findings do not rule out non-neurogenic etiologies.
>
> Lumbar radiculopathy can be objectively confirmed with lateral bending radiographic studies. Proprioceptive disruption causes the spinous processes above and below an affected nerve root to rotate away from the side of lateral bending, which is contrary to normal motion toward the side of lateral bending. Radiographs are made with patient running his hand down the lateral thigh to the limit of motion without pelvic rotation.

431. Similarly, virtually all of the putative cervical VsNCT test reports generated by the VsNCT Defendants contained the following, identical "Diagnostic Summary":

> Higher amplitudes identify pathology with statistical sensitivity approaching 100%. Due to CNS interconnectivity sensory pathology influences conduction in adjacent nerves so correlation of the history and other findings is essential to differentiate secondary lesions,

and is necessary before initiating or changing treatment. Below normal amplitudes correlate with irritation and may suggest possible adjacent inflammatory activity, which warrants investigation to rule in or out possible concomitant pathology. Normal findings do not rule out non-neurogenic etiologies.

Cervical radiculopathy can be objectively confirmed by lateral bending radiographic studies. Proprioceptive disruption causes the spinous processes above and below an affected nerve root to rotate toward the side of head tilt, which is contrary to normal motion away from the side of head tilt. Anterior to posterior radiographs are taken with lateral head tilt to the limit of motion without head rotation.

432. The VsNCT Defendants' misrepresentations and phony "reports" were consciously designed to mislead Liberty into believing that it was obligated to pay for these services, when in fact Liberty was not.

### E. The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to Liberty Mutual

433. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of bills (i.e., NF-3 form, HCFA-1500 forms) and/or treatment reports through the Provider Defendants to Liberty Mutual seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

434. The bills and treatment reports submitted to Liberty Mutual by and on behalf of the Defendants were false and misleading in the following material respects:

(i) The bills and treatment reports uniformly misrepresented to Liberty Mutual that the Provider Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not properly licensed in that they were professional corporations that were fraudulently incorporated and/or unlawfully owned and controlled by the Management Defendants and/or split fees or paid kickbacks to the Management Defendants, who are not licensed medical professionals.

(ii) The bills and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to Liberty Mutual that the Fraudulent Services were medically necessary and rendered in accordance with the exercise of legitimate medical judgment by licensed professionals. In fact, the Fraudulent Services were not medically necessary and were performed pursuant to predetermined fraudulent

protocols controlled by laypersons and designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(iii) The bills and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## III. The Defendants' Fraudulent Concealment and Liberty Mutual's Justifiable Reliance

435. The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to Liberty Mutual.

436. To induce Liberty Mutual to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

437. In fact, the Defendants billed for the Fraudulent Services at the Jamaica Avenue Clinic through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing Liberty Mutual from identifying the fraudulent scheme at the Jamaica Avenue Clinic and the pattern of fraudulent charges submitted through any one entity.

438. Specifically, the Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that the Provider Defendants were fraudulently incorporated, unlawfully split fees with unlicensed persons, and/or engaged in kickback relationships with unlicensed persons.

439. Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the Fraudulent Services were medically

unnecessary and performed pursuant to fraudulent predetermined protocols controlled by laypersons and designed to maximize the charges that could be submitted rather than to benefit the Insureds who supposedly were subjected to them.

440. Once Liberty Mutual began to suspect that the Provider Defendants were engaged in fraudulent billing and treatment activities, Liberty Mutual requested many of the Provider Defendants to submit additional verification in accordance with the No-Fault regulations, including but not limited to, examinations under oath, to determine whether the charges submitted through the Defendants were legitimate.

441. Nevertheless, in an attempt to conceal their fraud, the Defendants systematically failed and/or refused to respond to repeated requests for verification of the charges submitted.

442. Liberty Mutual maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

443. In accordance with the No-Fault Laws, Liberty Mutual either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet Liberty Mutual failed to obtain compliance with the requests for additional verification), and, therefore, Liberty Mutual's time to pay or deny the claims has not yet expired.

444. The Defendants hired law firms to pursue collection of the fraudulent charges from Liberty Mutual and other insurers. These law firms routinely filed expensive and time-consuming litigation against Liberty Mutual and other insurers if the charges were not promptly paid in full.

445. Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims within 30 days.

446. The facially-valid documents submitted to Liberty Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause Liberty Mutual to rely upon them.

447. As a result, Liberty Mutual incurred damages of more than $870,000.00 based upon the fraudulent charges.

448. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Liberty Mutual, Liberty Mutual did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

449. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

450. There is an actual case in controversy between Liberty Mutual and the Defendants regarding more than $369,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to Liberty Mutual through the Provider Defendants.

451. The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because the Provider Defendants were fraudulently incorporated, and/or secretly and unlawfully owned and controlled by unlicensed individuals and entities.

452. The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because the Provider Defendants unlawfully split fees and/or engaged in unlawful

kickback arrangements with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits.

453. The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual through the Provider Defendants because the Fraudulent Services were not medically necessary and were provided pursuant to predetermined fraudulent protocols controlled by laypersons and designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

454. The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual through the Provider Defendants because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual.

455. Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual through the Provider Defendants.

**<u>SECOND CAUSE OF ACTION</u>**
**Against El-Sayed, Howell, Dublin, Collins, Benoit, Meng, Lantsman, Yumi, Potiha, Total Healthcare, Olshansky, VO Marketing, Lazarev, and City Med, (Violation of RICO, 18 U.S.C. § 1962(c))**

456. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

457. Moon Rehab, Kingston Medical, BD Medical, Alpine Chiropractic, Apple Chiropractic, MZ Acupuncture, Lantsman Acupuncture, Yumi Acupuncture, Brooklyn Precision, Shore Parkway, and Opus Psychological together constitute an association-in-fact "enterprise" (the "Jamaica Avenue Clinic Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engaged in, and the activities of which affected, interstate commerce.

458. The members of the Jamaica Avenue Clinic Fraud Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Moon Rehab, Kingston Medical, BD Medical, Alpine Chiropractic, Apple Chiropractic, MZ Acupuncture, Lantsman Acupuncture, Yumi Acupuncture, Brooklyn Precision, Shore Parkway, and Opus Psychological ostensibly are independent entities– with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to Liberty Mutual and other insurers from the Jamaica Avenue Clinic.

459. The Jamaica Avenue Clinic Fraud Enterprise has been operated under at least 11 different names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of Liberty Mutual and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one source. The Jamaica Avenue Clinic Enterprise also has been operated under at least 11 names in order to give the false appearance that the patient referrals between and among the members of the Jamaica Avenue Clinic Fraud Enterprise for the Fraudulent Services were arm's-length, legitimate referrals for medically necessary services, when in fact they were not. Accordingly, the execution of this scheme would be beyond the capacity of each member of the Jamaica Avenue Clinic Fraud Enterprise acting singly or without the aid of the others.

460. The Jamaica Avenue Clinic Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to Liberty

Mutual and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, by facilitating payments to runners and drivers to establish and cultivate a patient base at the clinic, by facilitating payments of kickbacks for patient referrals, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

461. El-Sayed, Howell, Dublin, Collins, Benoit, Meng, Lantsman, Yumi, Potiha, Total Healthcare, Olshansky, VO Marketing, Lazarev, and City Med were employed by and/or associated with the Jamaica Avenue Clinic Fraud Enterprise.

462. El-Sayed, Howell, Dublin, Collins, Benoit, Meng, Lantsman, Yumi, Potiha, Total Healthcare, Olshansky, VO Marketing, Lazarev, and City Med knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Jamaica Avenue Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that the Jamaica Avenue Clinic Fraud Enterprise was not eligible to receive under the No-Fault Laws because the billed-for services were illusory, medically unnecessary, and otherwise unreimbursable. A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "11."

463. The Jamaica Avenue Clinic Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.

The predicate acts of mail fraud are the regular way in which El-Sayed, Howell, Dublin, Collins, Benoit, Meng, Lantsman, Yumi, Potiha, Total Healthcare, Olshansky, VO Marketing, Lazarev, and City Med operate the Jamaica Avenue Clinic Fraud Enterprise, insofar as the enterprise is not engaged in a legitimate healthcare practice, and acts of mail fraud therefore are essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Jamaica Avenue Medical Clinic Fraud Enterprise to the present day.

464. The Jamaica Avenue Medical Clinic Fraud Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty Mutual and other insurers. These inherently unlawful acts are taken by the Jamaica Avenue Clinic Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent no-fault billing.

465. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $332,000.00 pursuant to the fraudulent bills submitted through the Jamaica Avenue Medical Clinic Enterprise.

466. By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against El-Sayed, Howell, Dublin, Collins, Benoit, Meng, Lantsman, Yumi, Potiha, Total Healthcare, Olshansky, VO Marketing, Lazarev, City Med and John Does Defendants Nos. 1-10.**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

467. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

468. El-Sayed, Howell, Dublin, Collins, Benoit, Meng, Lantsman, Yumi, Potiha, Total Healthcare, Olshansky, VO Marketing, Lazarev, City Med and John Does Defendants Nos. 1-10 are employed by and/or associated with the Jamaica Avenue Medical Clinic Fraud Enterprise.

469. El-Sayed, Howell, Dublin, Collins, Benoit, Meng, Lantsman, Yumi, Potiha, Total Healthcare, Olshansky, VO Marketing, Lazarev, City Med and John Does Defendants Nos. 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Jamaica Avenue Clinic Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that the Jamaica Avenue Clinic Fraud Enterprise was not eligible to receive under the No-Fault Laws because the billed-for services were illusory, medically unnecessary, and otherwise unreimbursable. A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "11." Each such mailing was made in furtherance of the mail fraud scheme.

470. El-Sayed, Howell, Dublin, Collins, Benoit, Meng, Lantsman, Yumi, Potiha, Total Healthcare, Olshansky, VO Marketing, Lazarev, City Med and John Does Defendants Nos. 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

471. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $332,000.00 pursuant to the fraudulent bills submitted through the Jamaica Avenue Clinic Fraud Enterprise.

472. By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Moon Rehab, El Sayed, and the Management Defendants**
**(Common Law Fraud)**

473. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

474. Moon Rehab, El Sayed, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

475. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Moon Rehab was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Moon Rehab was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in a scheme to defraud insurers involving illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants.

476. Moon Rehab, El Sayed, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Moon Rehab that were not compensable under the No-Fault Laws.

477. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $92,000.00 pursuant to the fraudulent bills submitted by the Defendants through Moon Rehab. The fraudulent bills identified to date submitted to Liberty Mutual are described, in part, in the chart annexed hereto as Exhibit "1."

478. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

479. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Moon Rehab, El Sayed, and the Management Defendants**
**(Unjust Enrichment)**

480. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

481. As set forth above, Moon Rehab, El Sayed, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

482. When Liberty Mutual paid the bills and charges submitted by or on behalf of Moon Rehab for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

483. Moon Rehab, El Sayed, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

484. Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

485. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $92,000.00.

**SIXTH CAUSE OF ACTION**
**Against Kingston Medical, Howell and the Management Defendants**
**(Common Law Fraud)**

486. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

487. Kingston Medical, Howell, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

488. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Kingston Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Moon Rehab was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the

professional corporation engaged in a scheme to defraud insurers involving illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants.

489. Kingston Medical, Howell, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Kingston Medical that were not compensable under the No-Fault Laws.

490. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $19,000.00 pursuant to the fraudulent bills submitted by the Defendants through Kingston Medical. The fraudulent bills identified to date submitted to Liberty Mutual are described, in part, in the chart annexed hereto as Exhibit "2."

491. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

492. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**

**Against Kingston Medical, Howell, and the Management Defendants**
**(Unjust Enrichment)**

493. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

494. As set forth above, Kingston Medical, Howell, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

495. When Liberty Mutual paid the bills and charges submitted by or on behalf of Kingston Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

496. Kingston Medical, Howell, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

497. Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

498. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $19,000.00.

**EIGHTH CAUSE OF ACTION**
**Against Apple Chiropractic, Benoit, and the Management Defendants**
**(Common Law Fraud)**

499. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

500. Apple Chiropractic, Benoit, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally and knowingly made false and

fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

501. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Apple Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Apple Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in a scheme to defraud insurers involving illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants.

502. Apple Chiropractic, Benoit, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Apple Chiropractic that were not compensable under the No-Fault Laws.

503. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $59,000.00 pursuant to the fraudulent bills

submitted by the Defendants through Apple Chiropractic. The fraudulent bills identified to date submitted to Liberty Mutual are described, in part, in the chart annexed hereto as Exhibit "3."

504. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

505. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Apple Chiropractic, Benoit, and the Management Defendants
### (Unjust Enrichment)

506. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

507. As set forth above, Apple Chiropractic, Benoit, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

508. When Liberty Mutual paid the bills and charges submitted by or on behalf of Apple Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

509. Apple Chiropractic, Benoit, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

510. Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

511. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $59,000.00 .

## TENTH CAUSE OF ACTION
### Against Alpine Chiropractic, Collins, and the Management Defendants
### (Common Law Fraud)

512. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

513. Alpine Chiropractic, Collins, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

514. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Alpine Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Alpine Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in a scheme to defraud insurers involving illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants.

515. Alpine Chiropractic, Collins, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Alpine Chiropractic that were not compensable under the No-Fault Laws.

516. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $12,000.00 pursuant to the fraudulent bills submitted by the Defendants through Alpine Chiropractic. The fraudulent bills identified to date submitted to Liberty Mutual are described, in part, in the chart annexed hereto as Exhibit "4."

517. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

518. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Alpine Chiropractic, Collins, and the Management Defendants
### (Unjust Enrichment)

519. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

520. As set forth above, Alpine Chiropractic, Collins, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

521. When Liberty Mutual paid the bills and charges submitted by or on behalf of Alpine Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

522. Alpine Chiropractic, Collins, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

523. Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

524. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $12,000.00.

**TWELFTH CAUSE OF ACTION**
**Against MZ Acupuncture, Meng, and the Management Defendants**
**(Common Law Fraud)**

525. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

526. MZ Acupuncture, Meng, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

527. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that MZ Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that MZ Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the

professional corporation engaged in a scheme to defraud insurers involving illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants.

528. MZ Acupuncture, Meng, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through MZ Acupuncture that were not compensable under the No-Fault Laws.

529. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $17,000.00 pursuant to the fraudulent bills submitted by the Defendants through MZ Acupuncture. The fraudulent bills identified to date submitted to Liberty Mutual are described, in part, in the chart annexed hereto as Exhibit "5."

530. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

531. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against MZ Acupuncture, Meng, and the Management Defendants**
**(Unjust Enrichment)**

532. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

533. As set forth above, MZ Acupuncture, Meng, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

534. When Liberty Mutual paid the bills and charges submitted by or on behalf of MZ Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

535. MZ Acupuncture, Meng, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

536. Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

537. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $17,000.00.

**FOURTEENTH CAUSE OF ACTION**
**Against Lantsman Acupuncture, Lantsman, and the Management Defendants**
**(Common Law Fraud)**

538. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

539. Lantsman Acupuncture, Lantsman, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally and knowingly made

false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

540. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Lantsman Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Lantsman Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in a scheme to defraud insurers involving illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants.

541. Lantsman Acupuncture, Lantsman, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Lantsman Acupuncture that were not compensable under the No-Fault Laws.

542. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $40,000.00 pursuant to the fraudulent bills

submitted by the Defendants through Lantsman Acupuncture. The fraudulent bills identified to date submitted to Liberty Mutual are described, in part, in the chart annexed hereto as Exhibit "6."

543. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

544. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Lantsman Acupuncture, Lantsman, and the Management Defendants
### (Unjust Enrichment)

545. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

546. As set forth above, Lantsman Acupuncture, Lantsman, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

547. When Liberty Mutual paid the bills and charges submitted by or on behalf of Lantsman Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

548. Lantsman Acupuncture, Lantsman, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

549. Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

550. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $40,000.00.

**SIXTEENTH CAUSE OF ACTION**
**Against Yumi Acupuncture, Yumi, and the Management Defendants**
**(Common Law Fraud)**

551. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

552. Yumi Acupuncture, Yumi, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

553. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Yumi Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Yumi Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in a scheme to defraud insurers involving illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants.

554. Yumi Acupuncture, Yumi, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Yumi Acupuncture that were not compensable under the No-Fault Laws.

555. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $21,000.00 pursuant to the fraudulent bills submitted by the Defendants through Yumi Acupuncture. The fraudulent bills identified to date submitted to Liberty Mutual are described, in part, in the chart annexed hereto as Exhibit "7."

556. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

557. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
## Against Yumi Acupuncture, Yumi, and the Management Defendants
## (Unjust Enrichment)

558. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

559. As set forth above, Yumi Acupuncture, Yumi, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

560. When Liberty Mutual paid the bills and charges submitted by or on behalf of Yumi Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

561. Yumi Acupuncture, Yumi, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

562. Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

563. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $21,000.00.

## EIGHTEENTH CAUSE OF ACTION
**Against Opus Psychological, Uchendu, and the Management Defendants**
**(Common Law Fraud)**

564. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

565. Opus Psychological, Uchendu, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

566. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Opus Psychological was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in a scheme to defraud involving illegal fee-splitting and kickback arrangements with non-medical professionals; and (ii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the

billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants.

567. Opus Psychological, Uchendu, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Opus Psychological that were not compensable under the No-Fault Laws.

568. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $46,000.00 pursuant to the fraudulent bills submitted by the Defendants through Opus Psychological. The fraudulent bills identified to date submitted to Liberty Mutual are described, in part, in the chart annexed hereto as Exhibit "8."

569. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

570. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
**Against Opus Psychological, Uchendu, and the Management Defendants**
**(Unjust Enrichment)**

571. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

572. As set forth above, Opus Psychological, Uchendu, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

573. When Liberty Mutual paid the bills and charges submitted by or on behalf of Opus Psychological for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

574. Opus Psychological, Uchendu, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

575. Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

576. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $46,000.00.

## TWENTIETH CAUSE OF ACTION
**Against Brooklyn Precision, Mills, and the Management Defendants**
**(Common Law Fraud)**

577. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

578. Brooklyn Precision, Mills, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

579. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Brooklyn Precision was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged

in a scheme to defraud involving illegal fee-splitting and kickback arrangements with non-medical professionals; and (ii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants.

580. Brooklyn Precision, Mills, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Brooklyn Precision that were not compensable under the No-Fault Laws.

581. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $22,000.00 pursuant to the fraudulent bills submitted by the Defendants through Brooklyn Precision. The fraudulent bills identified to date submitted to Liberty Mutual are described, in part, in the chart annexed hereto as Exhibit "9."

582. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

583. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION
**Against Brooklyn Precision, Mills, and the Management Defendants**
**(Unjust Enrichment)**

584. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

585. As set forth above, Brooklyn Precision, Mills, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

586. When Liberty Mutual paid the bills and charges submitted by or on behalf of Brooklyn Precision for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

587. Brooklyn Precision, Mills, Olshansky, VO Marketing, Potiha, Total Healthcare, Lazarev, City Med, and John Doe Defendants 1-10 have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

588. Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

589. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $22,000.00.

## JURY DEMAND

590. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., Liberty Mutual Indemnity Co., Liberty Mutual General Insurance Company and Liberty Mutual Casualty Co. demand that a Judgment be entered in their favor:

A. On the First Cause of Action against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual;

B. On the Second Cause of Action against El-Sayed, Howell, Dublin, Collins, Benoit, Meng, Lantsman, Yumi, Potiha, Total Healthcare, Olshansky, VO Marketing, Lazarev, and City Med, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $332,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C. On the Third Cause of Action against El-Sayed, Howell, Dublin, Collins, Benoit, Meng, Lantsman, Yumi, Potiha, Total Healthcare, Olshansky, VO Marketing, Lazarev, and City Med, more than $332,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

D. On the Fourth Cause of Action against Moon Rehab, El Sayed, and the Management Defendants, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $92,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E. On the Fifth Cause of Action against Moon Rehab, El Sayed, and the Management Defendants, more than $92,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F. On the Sixth Cause of Action against Kingston Medical, Howell and the Management Defendants, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $19,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G. On the Seventh Cause of Action against Kingston Medical, Howell and the Management Defendants, more than $19,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H. On the Eighth Cause of Action against Apple Chiropractic, Benoit, and the Management Defendants, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $59,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I. On the Ninth Cause of Action against Apple Chiropractic, Benoit, and the Management Defendants, more than $59,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J. On the Tenth Cause of Action against Alpine Chiropractic, Collins, and the Management Defendants, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $12,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K. On the Eleventh Cause of Action against Alpine Chiropractic, Collins, and the Management Defendants, more than $12,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

L. On the Twelfth Cause of Action against MZ Acupuncture, Meng, and the Management Defendants, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $17,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M. On the Thirteenth Cause of Action against MZ Acupuncture, Meng, and the Management Defendants, more than $17,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N. On the Fourteenth Cause of Action against Lantsman Acupuncture, Lantsman, and the Management Defendants, compensatory damages in favor of Liberty Mutual an amount

to be determined at trial but in excess of $40,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O. On the Fifteenth Cause of Action against Lantsman Acupuncture, Lantsman, and the Management Defendants, more than $40,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

P. On the Sixteenth Cause of Action against Yumi Acupuncture, Yumi, and the Management Defendants, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $21,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q. On the Seventeenth Cause of Action against Yumi Acupuncture, Yumi, and the Management Defendants, more than $21,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

R. On the Eighteenth Cause of Action against Opus Psychological, Uchendu, and the Management Defendants, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $46,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

S. On the Nineteenth Cause of Action against Opus Psychological, Uchendu, and the Management Defendants, more than $46,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

T. On the Twentieth Cause of Action against Brooklyn Precision, Mills, and the Management Defendants, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $22,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U. On the Twenty-First Cause of Action against Brooklyn Precision, Mills, and the Management Defendants, more than$22,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

V. For such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
June 22, 2017

RIVKIN RADLER LLP

By: ______________________________

Michael A. Sirignano (MS 5263)
Barry I. Levy (BL 2190)
Steven T. Henesy (SH 6357)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company*